STATE OF CONNECTICUT *v.* JUAN VAZQUEZ
(AC 23472)

Flynn, Bishop and Mihalakos, Js.

---

Argued May 27—officially released September 2, 2003

*Felix Esposito*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Christopher L. Morano*, chief state's attorney, *Kathleen E. McNamara*, senior assistant state's attorney, and *Louis J. Luba, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Juan Vazquez, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a, and one count of conspiracy to com-

mit murder in violation of General Statutes §§ 53a-48 and § 53a-54a. The defendant claims that he was denied a fair trial because of a repeated pattern of prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of July 29, 1996, John Townsend, the victim, and John Okon went to a bar in Southington for a few drinks. At around midnight, the two decided to pool their money and attempt to buy some cocaine. They then drove to a housing project on Willow Street in New Britain. Okon remained in the car as the victim got out and approached some men to ask where cocaine might be purchased. After some discussion, the victim returned to the car with the cocaine. As they began to drive off, something hit the car, and the victim instructed Okon, who was driving, to stop. The victim exited the car to investigate. Moments later, Okon heard a shot, got out of the car and saw the victim lying on the ground, dead. Okon drove away from the scene until he found a police officer to whom to report the event.

At trial, in August, 2001, the state called, inter alios, two witnesses, Madelyn Cruz and Sheila Calderon, who claimed to have seen the defendant shoot the victim in the head and then flee the scene. The defendant also testified. Subsequently, the defendant was convicted of murder and conspiracy to commit murder.

On appeal, the defendant claims that the prosecutor engaged in a pattern of misconduct that deprived the defendant of a fair trial. Although the defendant did not preserve his claims at trial, because he contends that he was deprived of a constitutional right, he requests review pursuant to State v. Golding, 213 Conn. 233, 567 A.2d 823 (1989). In the alternative, he requests plain error review and review in derivation of this court's inherent supervisory authority over the administration of justice.

Specifically, the defendant claims that the prosecutor (1) improperly impugned the defendant's character during cross-examination, in particular with evidence of prior bad acts, (2) implied that the defendant was lying, (3) commented negatively on the defendant's right to assist in his defense, (4) invited the defendant to comment on the credibility of other witnesses, (5) improperly vouched for the credibility of several state's witnesses and (6) commented on facts not in evidence. Additional facts will be introduced as necessary.

I

As the defendant's claims were not preserved at trial, he now seeks review under *State* v. *Golding*, supra, 213 Conn. 233. Accordingly, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. "The first two conditions are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself." *State* v. *Graham*, 33 Conn. App. 432, 442, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994). When any one of those conditions is not satisfied, the claim will fail. *State* v. *Golding*, supra, 240.

As an initial matter, we conclude that the first two prongs of *Golding* have been met. The record is adequate for review, and it is well settled that prosecutorial misconduct can result in the deprivation of a defen-

dant's due process right to a fair trial.[1] See *State* v. *Singh*, 259 Conn. 693, 700–701, 793 A.2d 226 (2002); *State* v. *Alexander*, 254 Conn. 290, 303–304, 755 A.2d 868 (2000).

The third prong of *Golding* requires the defendant to show that the alleged constitutional violation clearly existed and that it clearly deprived him of a fair trial. In cases of prosecutorial misconduct, to make that determination, we employ a two part test. *State* v. *Brown*, 71 Conn. App. 121, 128–29, 800 A.2d 674, cert. denied, 261 Conn. 940, 808 A.2d 1133 (2002). First, we determine if the remarks were improper, and, if they are found to be so, we determine whether they caused such substantial prejudice to the defendant as to deny him due process of law. See *State* v. *Yusuf*, 70 Conn. App. 594, 622, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002).

## A

The first part of our inquiry requires us to "determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial." *State* v. *Singh*, supra, 259 Conn. 702. We examine each of the alleged instances of misconduct, in turn, to assess whether they were, in fact, improper.

## 1

The first alleged instances of improper conduct by the prosecutor occurred during the cross-examination of the defendant. The defendant claims that the prosecutor exceeded the scope of inquiry established during the direct examination and, in so doing, introduced

---

[1] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

evidence that was prejudicial to the defendant.[2] In response, the state argues that "the door was opened" to the prosecutor's line of inquiry by defense counsel on direct examination.

Specifically, the defendant claims that the prosecutor's inquiry regarding the defendant's known associates and their proclivity toward guns was improper and prejudicial.[3] Additionally, the prosecutor inquired about

---

[2] The question we address is whether the prosecutor's inquiry was outside the scope of the direct examination. Among the defendant's claims, in that regard, is that the questions asked and answers given may have been prejudicial to the defendant's case. If the questions were proper, then it is of no legal consequence whether they, or their answers, prejudiced the defendant. See *Chouinard* v. *Marjani*, 21 Conn. App. 572, 576, 575 A.2d 238 (1990).

[3] The prosecutor cross-examined the defendant in relevant part as follows:

"[Prosecutor]: Have you ever been around guns?

"[Defendant]: Yes.

"[Prosecutor]: Have you ever had friends who had guns? . . .

"[Defendant]: Yes, yes.

"[Prosecutor]: Have you ever been around when a gun was shot?

"[Defendant]: Yes.

"[Prosecutor]: When?

"[Defendant]: Years ago.

"[Prosecutor]: Lots of times?

"[Defendant]: No.

"[Prosecutor]: No? Do you know who Darence Delgado is?

"[Defendant]: Yes.

"[Prosecutor]: Were you with Mr. Delgado on Willow Street?

"[Defendant]: Yes.

"[Prosecutor]: What happened to Mr. Delgado?

"[Defendant]: He got killed.

"[Prosecutor]: Were you there?

"[Defendant]: Yes, I was.

"[Prosecutor]: So, you saw a—a gun being fired.

"[Defendant]: Yes, a long time ago. . . .

"[Prosecutor]: . . . Do you know . . . Ariel Martinez?

"[Defendant]: Yes.

"[Prosecutor]: Who is Ariel Martinez?

"[Defendant]: He's my best friend.

"[Prosecutor]: And where is Ariel Martinez?

"[Defendant]: He died.

"[Prosecutor]: What happened to Ariel Martinez?

"[Defendant]: He got killed.

"[Prosecutor]: How?

"[Defendant]: A shooting in front of—

"[Prosecutor]: He was shot?

"[Defendant]:—his kids. Yeah.

"[Prosecutor]: Who else are your friends? You didn't tell [defense counsel] who your friends were. Who else—what other friends do you have?

"[Defendant]: I have many friends.

"[Prosecutor]: What are their names?

"[Defendant]: Ramon, Frankie . . . .

"[Prosecutor]: Who's Frankie?

"[Defendant]: Frankie is—is one of my best friends.

"[Prosecutor]: Frankie Figueroa?

"[Defendant]: Yes he is.

"[Prosecutor]: What's his street name?

"[Defendant]: Don't know.

"[Prosecutor]: Scarface?

"[Defendant]: I don't know.

"[Prosecutor]: Frankie Figueroa, one of your friends, and you don't know his street name?

"[Defendant]: He doesn't have a street name.

"[Prosecutor]: Okay.

"[Defendant]: To me, he's Frankie. I grew up—

"[Prosecutor]: Okay.

"[Defendant]:—I grew up with him. . . .

"[Prosecutor]: How about Edwin Sanchez?

"[Defendant]: Yes.

"[Prosecutor]: He's a friend of yours. Isn't he?

"[Defendant]: Yes, he is.

"[Prosecutor]: He was with you the day when Darence Delgado got shot. Wasn't he?

"[Defendant]: No, he wasn't.

"[Prosecutor]: He wasn't?

"[Defendant]: No.

"[Prosecutor]: Where's Mr. Sanchez now?

"[Defendant]: In prison, I think. . . .

"[Prosecutor]: And he's in jail for killing Darence Delgado. Isn't that correct? Just answer the . . . .

"[Defendant]: I can't—

"[Prosecutor]: Yes or no?

"[Defendant]:—answer that question . . . because I don't know. . . .

"[Prosecutor]: Did you ever have a nine millimeter weapon?

"[Defendant]: No.

"[Prosecutor]: Did you ever shoot a nine millimeter weapon with your friends?

"[Defendant]: No.

"[Prosecutor]: How many of your friends were shot with nine millimeter weapons?

previous motor vehicle violations by the defendant[4] and a previous encounter with the police in an empty apartment on Willow Street,[5] and made a reference to the defendant's familiarity with police questioning techniques. The state claims that those subjects were broached first by defense counsel on direct examination and, thus, were a proper subject of inquiry.

We first examine the level of deference accorded to counsel when cross-examining a witness. In general, the court has wide discretion in setting the scope of cross-examination. *State* v. *Palozie*, 165 Conn. 288, 297, 334 A.2d 468 (1973). Although cross-examination is limited to the subject matter of the direct examination; *State* v. *Manning*, 162 Conn. 112, 116, 291 A.2d 750 (1971); the cross-examiner may elicit not only any fact that would tend to contradict or to qualify any particular fact stated on direct examination, but also anything that would tend to modify any conclusion or inference resulting from the facts so stated. See *Shulman* v. *Shul-*

"[Defendant]: I don't know. . . .

"[Prosecutor]: February 13, 1995, when you and Mr. Sanchez were sitting at 32 Willow Street and Mr. Sanchez was shot, were you there?

"[Defendant]: Mr. Sanchez was shot?

"[Prosecutor]: Yeah.

"[Defendant]: Oh, yeah. When he—yes, when he got shot on the head, yeah.

"[Prosecutor]: You were there.

"[Defendant]: Yes, I was.

"[Prosecutor]: Violence again comes close to you.

"[Defendant]: Huh?

"[Prosecutor]: Violence again comes close to you. You're always in the wrong place. Huh?

"[Defendant]: I guess so."

[4] The defendant admitted, during cross-examination, to having been stopped by police once while driving a car with Maine license plates. He denied another incident.

[5] The defendant admitted, during cross-examination, to an incident in which he was found by police in an empty apartment on Willow Street, at night, less than two months from the date of the shooting. We note that the prosecutor made no mention that this incident was an "illegal trespass," as characterized by the defendant.

*man,* 150 Conn. 651, 661, 193 A.2d 525 (1963); *Levine* v. *Marcus,* 90 Conn. 682, 684–85, 98 A. 348 (1916).

On direct examination, defense counsel asked the defendant about his experience with guns,[6] whether he owned a car, where he lived, whether he lived on Willow Street (where the shooting took place), the proximity of the location where he claimed to be on the night of the shooting and how he transported himself around. The defendant also testified that he had felt threatened by police at his initial interview, although he had submitted voluntarily to that interview.

The subject matter of the direct examination, thus, could lead to many exculpatory inferences, among them, that the defendant was unfamiliar with guns, had no access to guns, was unable to travel to Willow Street on the night of the shooting, did not drive a car,[7] did not live or frequently stay at Willow Street, and was unfamiliar with police protocol and procedure. The prosecutor's line of inquiry reasonably could be construed as addressing the defendant's familiarity with

[6] Defense counsel inquired in relevant part as follows:

"[Defense Counsel]: Did you ever own a gun?

"[Defendant]: No.

"[Defense Counsel]: Did you ever have a gun in your possession?

"[Defendant]: A real gun?.

"[Defense Counsel]: Yeah.

"[Defendant]: No.

"[Defense Counsel]: Did you ever fire a—a real gun?

"[Defendant]: No, never."

Additionally, on direct examination, the defense counsel brought up Calderon's testimony regarding a purported conversation between Calderon and the defendant:

"[Defense Counsel]: . . . Now, you heard—you heard Sheila Calderon mention that she saw you a couple weeks . . . after the shooting, and she asked you, 'How could you do that?' And you said, 'I'm used to it; you just don't look at them in the eyes; that way . . . it doesn't haunt you for life,' something to that effect. Did that conversation ever happen?

"[Defendant]: It never took place."

[7] The defendant also claimed, on cross-examination, that he had never driven a car.

guns and gun violence, as well as the defendant's access to guns, mode of transportation and frequency of his presence in the Willow Street area, and his candor about feeling threatened during a voluntary police interview.

As to the defendant's claim that the line of questioning was unfairly prejudicial, we note, as we previously have stated, that "[e]vidence that is inadmissibly prejudicial is not to be confused with evidence that is merely damaging. . . . All evidence adverse to a party is, to some degree, prejudicial." (Citation omitted.) *Chouinard* v. *Marjani*, 21 Conn. App. 572, 576, 575 A.2d 238 (1990). We therefore conclude that given the considerable leeway allowed to counsel on cross-examination to delve into subjects that have been even tangentially broached or their consequent inferences, the prosecutor's line of questioning, although perhaps overly zealous, was not improper.

2

The defendant next claims that the prosecutor implied that the defendant was lying at several junctures during cross-examination. In support of his claim, the defendant cites *State* v. *Alexander*, supra, 254 Conn. 290, for the proposition that "a prosecutor may not express her own opinion, either directly *or indirectly*, as to the credibility of a witness or the guilt of the defendant." (Emphasis added.) Id., 304.

The determination of whether the prosecutor insinuated, i.e., indirectly expressed her opinion, that the defendant was lying or was guilty is a particularly problematic one for this court to make. In essence, it requires us to conclude that the prosecutor meant to communicate something that facially is not reflected in the record. Such inferences, more likely, can be understood only by the tone and posture of the speaker and overall context of the remarks, but they are not supported by

the printed record.[8] From the record, we cannot say conclusively that those remarks were improper.

### 3

The defendant next claims that the prosecutor negatively commented on his right to assist in his defense, thereby impermissibly burdening his right to present a defense. That claim lacks merit. The most substantial claim in that regard concerns comments made by the prosecutor on the defendant's taking notes during certain witnesses' testimony. It is difficult to fathom how any negative inferences could be drawn from those comments. At worst, we find them analogous to commentary on the defendant's ability to tailor his testimony based on the fact that he was the last person to testify. Such comments are not improper. See id., 294. The other instances of allegedly impermissible commentary concern remarks that were not facially improper. See part I A 2.

### 4

The defendant next claims that the prosecutor improperly invited the defendant to characterize other witnesses' testimony[9] and, in doing so, improperly argued that for the defendant to be innocent, several witnesses had to be lying.

It is a well established evidentiary rule that it is improper to ask a witness to comment on another wit-

---

[8] As an example of the remarks in question, the prosecutor asked the defendant: "[Y]ou wouldn't make anything up. Would you?" It is not hard to imagine that being spoken in a tone laden with sarcasm, insinuating the opposite of what the question expresses. If asked by the prosecutor of a state's witness, it could be imagined to mean exactly what it expresses. The record speaks only in monotone.

[9] The defendant cites, as another example of that allegedly improper conduct, a question by the prosecutor during cross-examination regarding the veracity of a police officer's report concerning the defendant's alleged motor vehicle violation. We note that the reporting officer was not a witness in this case, nor was the report in evidence.

ness' veracity. *State* v. *Singh*, supra, 259 Conn. 706. The rationale behind that rule is multifold. First, determinations of credibility are for the jury and not the witnesses. Id., 707. As a result, questions asked of witnesses concerning the veracity of other witnesses invade the province of the jury. Id. Also, such questions have no probative value, are generally argumentative and are improper. Id., 707–708. Those questions can create a serious problem in that a jury may conclude that to acquit the defendant, it must also find that a witness has lied. Id., 708. That potential problem is compounded when the witness about whom the defendant is asked to pass judgment is a law enforcement officer, as juries are likely to be inclined to put faith in such figures. Id.; see also *United States* v. *Fernandez*, 145 F.3d 59, 64 (1st Cir. 1998).

When the prosecutor questioned the defendant as to why a witness, Calderon, would identify the defendant as the shooter, the following colloquy occurred:

"[Prosecutor]: And you and [Calderon] and [Cruz] were watching TV.

"[Defendant]: No.

"[Prosecutor]: You weren't watching TV with them?

"[Defendant]: No, I was not.

"[Prosecutor]: Okay. So [Calderon], who—a fifteen-year-old girl at the time of this murder, out of a clear blue, decides she's going to pin it on you. Is that right?

"[Defendant]: I guess so. . . .

"[Prosecutor]: So, out of a clear blue, she made up this story to get you.

"[Defendant]: It's possible."

The prosecutor next invited the defendant to comment on the veracity of Detectives Thomas Hayes and Cary Carlone, who also were witnesses:

"[Prosecutor]: And Detective Hayes made up this story to get you. Isn't that right?

"[Defendant]: Detective Hayes—I answered all of Detective Hayes' questions.

"[Prosecutor]: And Detective Carlone made up all these things, just to get you. Isn't that right?

"[Defendant]: Like I said, I answered all their questions."

Those comments are precisely the type of questions admonished against in *Singh* and they are improper.[10]

5

The defendant next claims that the prosecutor improperly vouched for the credibility of several state's witnesses during closing argument.

The parameters of proper argument by a prosecutor during closing argument are well established. "[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument. . . . The prosecutor [however] may not express his own

---

[10] The defendant additionally claims that the prosecutor invited several state's witnesses to comment on their own credibility. We interpret the remarks in question as inquiries into their potential motivation for lying and their awareness of the ramifications of not telling the truth. We have long held that "[a]n important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959)." (Internal quotation marks omitted.) *State* v. *Privitera*, 1 Conn. App. 709, 712, 476 A.2d 605 (1984). We conclude that this is equally true of direct examination. Those questions, therefore, were not improper.

opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and, consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 712–13.

The statements made by the prosecutor during her closing argument, which the defendant claims fall outside the bounds of propriety as defined by *Singh*, were as follows: "And [Calderon] came in and told you what she saw, and [Cruz] came in and told you what she saw. And they told you the truth, because they will never forget that night in July." Later in her closing argument, the prosecutor stated: "[Y]ou may not like John Okon. You may not like Madelyn Cruz. You may not like Sheila Calderon. You may not like their personal habits or their child rearing techniques. . . . Crimes take place with people that they're comfortable with. And people that they're comfortable with may not have sterling reputations, but they know the solemnity of their oath. And police officers know their oath. They came into court and raised their hand to tell the truth, and that's exactly what these witnesses did." We conclude that those comments constitute impermissible commentary by the prosecutor on the credibility of the state's witnesses.[11]

Later in her argument, the prosecutor stated: "Now, if they didn't see John Townsend before the murder and they only saw him lying on the pavement, how

[11] The state, at oral argument, conceded that those remarks by the prosecutor were improper.

would they know how tall he was? How would they know that he was taller than the defendant? Do you know how they knew? *Because what Sheila testified to and what Madelyn Cruz testified to is the truth.* . . . They didn't go down with a measuring tape, as he lay on the pavement, and measure him and say, hey, he's six foot; he's a tall guy. No. They actually observed the murder. *They couldn't make that up.*" (Emphasis added.)

The impropriety of the prosecutor's comments, vouching for the truthfulness of the witnesses' testimony, is not open to question. It was clearly improper. The propriety of the balance of the prosecutor's comments in that part of her argument is less easily determined. As the defendant points out, in *State* v. *Alexander*, supra, 254 Conn. 301, somewhat similar comments by the prosecutor were found by this court and on review by our Supreme Court[12] to be improper. In *State* v. *Rivera*, 61 Conn. App. 763, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001), we concluded, however, that "[a] prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses . . . . The prosecutor may, however, argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 775.

---

[12] See *State* v. *Alexander*, 50 Conn. App. 242, 718 A.2d 66 (1998), rev'd in part, 254 Conn. 290, 755 A.2d 868 (2000). In *Alexander*, the prosecutor argued that "[the victim] knew when she came to court she had to tell the truth. *And that's what she did.* . . . And how does she remember she was eight? Because I didn't know him when I was seven. *That's how little kids think. They can't make this up.* . . . And, if she was lying, she would have changed her story. . . . And, why didn't she do it? *Because she told the truth.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Alexander*, supra, 254 Conn. 301. Our Supreme Court found that "[t]hese statements are improper vouchers for the victim's credibility." Id., 305.

We conclude that the prosecutor's comments in this case, regarding the height of the victim and the inferences to be drawn from the witnesses' knowledge of it, namely, that they actually had observed the murder, were of the type of permissible commentary approved in *Rivera* and not of the type barred by *Alexander*. In *Alexander*, the prosecutor argued, essentially, that the child witness, because she was a child, was incapable of fabricating the details of her testimony. Here, the prosecutor argued that because the witnesses accurately had testified about the relative heights of the victim and the defendant, the jury should infer that they actually had witnessed the scene. The comments were not so much based on the opinion of the prosecutor as from inferences properly drawn from evidence in the case. We conclude, therefore, that those latter comments by the prosecutor were not improper.

6

The defendant next claims that the prosecutor improperly commented on facts that were not in evidence during closing argument. Our law on the subject dictates that "[w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 254 Conn. 302.

The comments to which the defendant objects concern an analogy drawn between the experience of the two eyewitnesses who allegedly viewed the murder and the experiences of the jurors who may have witnessed several notable historical events.[13] The danger, the

[13] The prosecutor argued as follows: "Sheila Calderon, a fifteen year old girl at that time, will never forget [the shooting]. . . . Yeah, she didn't remember where the children were. Sheila didn't remember exactly who was in the apartment. She didn't remember where she went.

defendant argues, is that the prosecutor was, in effect, giving expert testimony about the reliability of eyewitnesses' memory.

A similar argument was used by the prosecutor in *State* v. *Briley*, 55 Conn. App. 258, 739 A.2d 293, cert. denied, 251 Conn. 927, 742 A.2d 363 (1999). When that conduct was challenged on appeal as demonstrating prosecutorial misconduct, this court determined that the comments had been invited. We therefore did not reach the question of whether they were improper. Although the comments in *Briley* were similar to the comments made by the prosecutor here, the circumstances are distinguishable. In *Briley*, the argument was directed at the reliability of an eyewitness identification by a bank teller who was robbed at gunpoint by a stranger. The teller later identified the robber from police photographs. Following the prosecutor's controversial argument to the jury, the defendant advanced the claim that the prosecutor had, in effect, given expert testimony to the jury that was contrary to modern scholarship on the reliability of eyewitness memory.[14] Id., 261.

"Well, I'm going to ask you to recall, yourself, back to the [John F.] Kennedy assassination, for those of us that are old enough to remember. You can probably remember very distinctly where you were, who told you. Can you remember what color shoes you had on that day? Can you remember who you rode home with that day? Can you remember what you had for lunch that day? Can you remember any of those facts, as that video played and played throughout the weekend of President Kennedy being assassinated? No. Why is that?

"This event, like the Kennedy assassination, the Martin Luther King assassination, the Challenger [space shuttle] crash, left an indelible impression on their minds, as those things left on yours. Some things in life you never forget: The tragic death of a loved one, a tragic scene you see on TV that you can't believe as it unfolds, but that will stay with you [throughout] your life."

[14] "It is apparent that the remarks of the state's attorney were invited by the comments of defense counsel in challenging the reliability of [the witnesses'] identification of the defendant, which was based on the short period of time in which she saw him in the bank." *State* v. *Briley*, supra, 55 Conn. App. 263.

Here, the issue is not the ability of the eyewitnesses to identify the defendant. The defendant was a friend of both eyewitnesses, he had spent the evening with them watching television and had left the apartment moments before the shooting with gun in hand. At trial, no one advanced a theory or put into question the fact that either or both witnesses might have misidentified the defendant. The prosecutor's argument cannot, then, reasonably be construed as an effort to convince the jurors that because of the shocking nature of the event, their ability to identify the defendant as the shooter was somehow enhanced, as the prosecutor in *Briley* argued.

To the extent that by citing in her argument the impact of certain historical events, the prosecutor was suggesting that people who witness terrible and momentous occurrences will not soon forget them, we regard that as within the realm of permissible rhetorical argument. "The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 712. Further, the argument was one made from common sense and was not the subject of expert testimony. The jurors were fully capable of assessing its merits using their experience and without other extrinsic evidence. "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom. . . . Faced with the evidence before them, the jurors [rely] on their own observations and experience of the affairs of life to determine the credibility of the witnesses in reaching their verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 158, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998). We conclude that the comments were not improper.

B

Having determined that the prosecutor, in cross-examination and in closing argument, acted improperly,

we must next determine whether the improprieties created such substantial prejudice as to infringe on the defendant's constitutional right to a fair trial.

In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, we have focused on several factors. "Those factors include (1) the extent to which the misconduct was invited by defense conduct or argument, (2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case." *State* v. *Brown*, supra, 71 Conn. App. 130, citing *State* v. *Singh*, supra, 259 Conn. 700–701. From those factors, it is evident that the prosecutor's conduct alone is not dispositive, but the inquiry is guided primarily by the fairness of the trial as a whole. *State* v. *Singh*, supra, 701.

To reiterate, the conduct that we have determined to be improper consisted of the prosecutor's improperly inviting the defendant to characterize other witnesses' testimony during cross-examination and the prosecutor's improperly vouching for the credibility of several state's witnesses during closing argument. We examine each instance in turn.

1

First, we apply the factors discussed in *State* v. *Brown*, supra, 71 Conn. App. 130, to the comments by the prosecutor asking the defendant to characterize the testimony of the witnesses, Cruz and Calderon, as well as that of the detectives, Hayes and Carlone. Essentially, she asked the defendant whether the witnesses had "made up" their testimony. Aside from the basic premise that the defendant testified that he did not shoot the victim and was elsewhere on the night of the shooting, we find nothing in the record of the defense examination that would invite the prosecutor's questions.

In asking the defendant to characterize the testimony of the two eyewitnesses to the shooting, the prosecutor invited the defendant to give an opinion on the central evidence in the case. In regard to the attempt by the prosecutor to invite the defendant to comment on the detectives' testimony, we regard that as less troublesome. Although it is true that generally, inviting such a characterization of a "government [witness] in a criminal case" is particularly dangerous; *State* v. *Singh*, supra, 259 Conn. 708; here, the evidence about which the detectives testified was largely circumstantial and less central to the state's case.

The curative measures for that particular misconduct were diffuse, as the questions were not objected to at trial and no particular curative instructions were requested. The court did, however, give proper instructions defining the role of the jury as the exclusive finder of facts and assessor of credibility. The court's instructions, in that regard, were extensive and thorough. Additionally, the court, sua sponte, addressed the credibility of police officers as witnesses: "The testimony of a police officer is entitled to no special or exclusive sanctity merely because it comes from a police officer. A police officer who takes the witness stand subjects his testimony to the same examination and the same tests that any other witness does, and in the case of a police officer, you should not believe him . . . merely because he is a police officer."

Although the testimony of the two eyewitnesses to the shooting was central to the state's case, their credibility was bolstered by the state's evidence, which largely reinforced their testimony. Although no weapon was recovered, the police had significant circumstantial evidence to support the eyewitnesses' version of events. As mentioned, the witnesses were acquaintances of the defendant, both of whom testified that they were watching television with him shortly before the murder. They

testified that his friend, Pep, had come to the door and told the defendant that a man was outside trying to "beat him" for his drugs. They both testified that the defendant had retrieved a nine millimeter handgun and left the apartment with Pep. They further testified that they watched[15] as the defendant confronted the victim, pulled the gun from behind his back, reached up to the taller victim and shot him once in the side of the head, at close range, as he was walking away. They both testified that the defendant returned to the house and fled out the back window.

The state produced witnesses to attest that the victim, who was taller than the defendant, was, in fact, shot in the side of the head at close range. A nine millimeter bullet casing was found within five feet of the victim's body. Okon testified that the victim had been attempting to procure drugs. Crack cocaine was found in the victim's vest pocket. Furthermore, each witness' testimony supported the other's in great detail. Although discrepancies existed as to the color of the gun used and which hand the defendant had used to shoot the victim, the witness' versions of the evening's events were in significant accord. Those facts independently corroborated each witness' testimony.

2

In regard to the second instance of improper conduct by the prosecutor, we again apply the *Singh* factors. As described in part I A 5, the prosecutor during closing argument improperly vouched for the credibility of several state's witnesses, including Cruz, Calderon, Okon and, more generally, "the police officers."

---

[15] The two witnesses gave written statements in July, 1997, and also testified at the trial in August, 2001. In the written statements, both attested that they had watched the murder from a bedroom window. At trial, Calderon testified that she walked out to the parking lot with the defendant. Cruz testified that she watched from a bedroom window.

The remarks regarding the truthfulness of Cruz, Calderon and Okon were uninvited. As with the prosecutor's improper conduct during cross-examination, that misconduct involved the credibility of the state's witnesses, witnesses who were central to the critical issues in the case. Although at times throughout his closing argument, defense counsel commented on the discrepancies in the eyewitnesses' testimony, nowhere did he impugn their truthfulness.

Additionally, we are not persuaded by the state's argument that some of the prosecutor's comments vouching for witnesses were invited. Although defense counsel did broach the subject of a credibility contest between the defendant and the police, that appropriate argument was not a basis for the prosecutor's response vouching for the truthfulness of the police officers.[16] For the reasons we have stated, we consider commentary by counsel on witnesses' credibility to be an invasion of the province of the jury, and, consequently, improper. That particular conduct, however, was relatively isolated and brief. To the extent that the prosecutor improperly commented on the credibility of the police officers and Okon, whose testimony concerned more circumstantial matters, the commentary was of less importance than commentary on the truthfulness of the eyewitnesses.

Regarding curative measures, the discussion in part I B 1 applies equally here. None was requested, but the court was nonetheless extremely thorough, especially when addressing the role and responsibility of the jury. The court stated in relevant part: "[I]t's the jury's province and sole responsibility to pass upon the disputed

---

[16] Defense counsel argued: "Now, once again, because it's the police, we're supposed to just believe the police, and if it's [the defendant], you just don't believe him. And that's—that's the way . . . they want the game to be played, and that's not the way the game is to be played. It's for you, the jury, to decide who you want to believe here."

facts . . . . And in so doing, you ascertain where the truth lies. . . . And no matter what I may say concerning the facts or what the lawyers have said to you, it's your recollection of the facts which is to guide you in deciding this case. . . . And what the lawyers say to you and what I say to you as to the facts . . . should have weight with you only so far as you approve of it in your minds. . . .

"Now, in this case, you've had a number of witnesses appear before you and, therefore, you'll be interested in the rule of law relating to credibility, that is, how to decide, in your own minds, whether a witness is telling the truth. The credibility of witnesses and the weight to be given their testimony are matters . . . which it is peculiarly your function to determine."

Additionally, the court gave a limiting instruction on the remarks made by lawyers. The court stated: "[R]emember that certain things are not evidence, and you should not consider them in deciding what the facts are . . . . Arguments and statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments and other times during the trial, that's intended to help you interpret evidence, but it's not evidence. If the facts as you remember them differ from the way the lawyers have stated them to you, it's your memory that controls." Despite the fact that no curative instructions were requested, we consider those instructions to be particularly strong.

We conclude that any harm that may have been caused by the improper remarks by the prosecutor during cross-examination and in closing arguments was mitigated by the strength of the case against the defendant and the court's instructions to the jury. Although the prosecutor's comments in both instances concerned the credibility of the two eyewitnesses whose testimony was central to the state's case, their testimony was

corroborated independently, and the court's instructions were clear that credibility determinations were the exclusive province of the jury and that remarks by counsel were not to be considered evidence. It is well settled law that jurors "are presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). Here, during their deliberations, the jurors asked to reevaluate the testimony of both eyewitnesses and the defendant, indicating, if anything, that the jurors were determined to make their own credibility determinations and were not reliant on statements made by the prosecutor.

As a final consideration in our analysis, "[e]ven though we review this claim under the third prong of *Golding*, we note that [w]hen the principal participant in the trial whose function it is to protect the rights of his client does not deem an issue harmful enough to press in the trial court, the appellate claim that the same issue clearly deprived the defendant of a fundamental constitutional right and a fair trial . . . is seriously undercut." (Internal quotation marks omitted.) *State* v. *Cruz*, 75 Conn. App. 500, 509–10, 816 A.2d 683, cert. granted on other grounds, 263 Conn. 921, 822 A.2d 243 (2003).

We conclude, finally, that the defendant's claims fail under the third prong of *Golding*. Although the defendant has demonstrated that the prosecutor made improper remarks, we cannot conclude that they caused such substantial prejudice or so infected the trial with unfairness as to deny the defendant due process of law.

## II

Relying on our reasoning in part I, we further conclude that the defendant's claims of prosecutorial mis-

conduct do not warrant plain error review. Pursuant to Practice Book § 60-5, this court "may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . ." In cases of alleged prosecutorial misconduct, our law is well established that "a defendant may not prevail under . . . the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial. *State* v. *Satchwell,* 244 Conn. 547, 564, 710 A.2d 1348 (1998)." (Internal quotation marks omitted.) *State* v. *Brown,* supra, 71 Conn. 139. As we already have concluded, we believe that the defendant was not denied his right to a fair trial.

### III

Finally, the defendant requests, pursuant to our supervisory authority over the administration of justice, that we reverse the judgment. The defendant cites *State* v. *Brown,* 235 Conn. 502, 668 A.2d 1288 (1995), for the proposition that cases implicating a defendant's right to be tried before an impartial jury warrant the invocation of that supervisory authority.

In *Brown,* our Supreme Court stated that "[e]ven in the absence of constitutional violations . . . this court has supervisory authority over the administration of justice to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . In each case in which we have invoked our supervisory authority, we have acted to provide additional procedural safeguards for some salient aspect of the right to a trial before an impartial jury. See *State* v. *Breton,* [235 Conn. 206, 250, 663 A.2d 1026

(1995)] (special jury verdict form in death penalty cases); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in some death penalty cases); *State* v. *Patterson*, [230 Conn. 385, 397–98, 645 A.2d 535 (1994)] (personal judicial supervision of voir dire); *State* v. *Holloway*, [209 Conn. 636, 645–46, 553 A.2d 166] (judicial inquiry into bias claims at voir dire) [cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989)]. Similarly, in this case we are persuaded that a trial court must, when presented with any allegations of jury misconduct, conduct a preliminary inquiry, sua sponte if necessary, in order to assure itself that a defendant's constitutional right to a trial before an impartial jury has been fully protected." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 235 Conn. 528.

In this case, there were no allegations of juror misconduct, but of prosecutorial misconduct that might have usurped the jury's role as fact finder and determiner of credibility. The defendant's claims do not equate to allegations of juror bias or judicial impropriety. Furthermore, here, in contrast to *Brown*, the court did, sua sponte, seek to redress any potential harm caused by the prosecutor's improper remarks, even though no curative measures were requested by counsel. Therefore, given that we have concluded that the defendant received a fair trial, we believe that in this case it would be inappropriate as a matter of administration and misguided as a matter of justice to reverse the judgment.

The judgment is affirmed.

In this opinion the other judges concurred.