## STATE OF CONNECTICUT v. JONATHAN ALBINO
### (AC 32027)

Bishop, Bear and Mihalakos, Js.

Argued November 15, 2010—officially released August 23, 2011

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Raheem L. Mullins*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, former state's attorney, and *Patrick J. Griffin*, senior assistant state's attorney, for the appellee (state).

BEAR, J. The defendant, Jonathan Albino, appeals from the judgment of conviction, following a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims: (1) the trial court erred in refusing to give a lesser included offense instruction on criminally negligent homicide, (2) the prosecutor committed numerous acts of prosecutorial impropriety throughout the course of trial, which deprived the defendant of his constitutional right to a fair trial, and (3) the court improperly instructed the jury on the meaning of reasonable doubt. Although we agree that the prosecutor committed several improprieties during the trial, we, nonetheless, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Some months prior to the incident, the defendant moved to the Waterbury area from Puerto Rico. He worked daily selling heroin behind a three-story apartment building located at 132 Locust Street in Waterbury (building). He did not speak English, and most of his customers were of Puerto Rican descent and spoke Spanish. The heroin selling operation was run by William Ramos, who also was known as "Lolay." Ramos employed approximately five or six young men, including the defendant, who sold heroin to various customers at that location, which Ramos referred to as "the million dollar block . . . ." During his shift, which usually was from 3 to 10 p.m., the defendant carried a loaded firearm.

On September 18, 2006, the defendant worked his usual shift and then continued working later into the night. During that time, a woman named "Spicy" was having a party in the building, and people were congregating both inside and outside the building, while loud music played. Ramos, who testified for the state, was

on the second floor of the building overseeing his drug selling operation. At approximately 10:30 p.m., the defendant was sitting on the stairs just above the second floor landing when the victim, Christian Rivera, approached the building on a bicycle. When Rivera approached the stairwell, he had his hands in his pockets, and he was wearing a hooded sweatshirt with the hood up. The defendant descended the stairwell, thinking that Rivera was there to purchase heroin.

As Rivera approached the landing, the defendant, who could not see Rivera's face, instructed him in Spanish to remove his hands from his pockets and to take down the hood of his sweatshirt. Rivera did not respond to the defendant's instructions and continued his approach. Rivera was not acting in an aggressive manner, and Ramos saw nothing in Rivera's actions that caused him concern. As the defendant and Rivera came into contact with one another, the defendant pushed Rivera and again ordered him to take his hands out of his pockets and to remove his hood. Again, Rivera did not respond to the defendant, kept his hands in his pockets and continued to move forward. The defendant pushed Rivera a second time and felt something hard in Rivera's pocket. The defendant then brandished a nine millimeter semiautomatic firearm, pulled back the slide and aimed the firearm at Rivera. Ramos yelled at the defendant, asking him what he was doing and why he was pulling out the gun. The defendant fired the weapon approximately eight times at close range, hitting Rivera four times. The defendant stopped firing when Rivera fell to the ground. Three of the four bullets that hit Rivera entered and exited his body; one bullet remained lodged in his pelvis. Rivera died as a result of these gunshot wounds. When the police found Rivera's body, he had no weapons, money or identification on him. He did, however, have a bottle of Poland Spring water in his pocket. The medical examiner's office

determined that Rivera had wounds to his left upper back, his right upper chest, his left ear, his right cheek, the back of his neck, the back of his left thigh, the right side of his forehead, across his right shoulder and behind one of his knees. The bullet wound to the left side of Rivera's upper back was an entrance wound, with the wound to his right upper chest being the exit wound from that same bullet. These wounds caused significant blood loss. The bullet wound to the back of Rivera's neck also was an entrance wound. The wound to the back of Rivera's left thigh was an entrance wound as well; that bullet, however, remained lodged in Rivera's pelvis. Accordingly, three of the four bullets that struck Rivera, entered from the back of his body.

Immediately after the shooting, the defendant ran upstairs and gave the firearm to his friend, Angel Garcia, and then left the scene. The defendant removed the red T-shirt he had been wearing and discarded it into some bushes. He later telephoned his friend, Jose Velez, telling Velez that he needed to get away because he had shot someone. Velez, who had planned on going to New York, offered the defendant a ride, which he accepted. During the ride, the defendant told Velez and the other men in the vehicle, Luis Rios and Zachary Gonzalez, that he had shot a man on Locust Street because the man would not respond to his orders. Rios and the defendant stayed at a hotel in New York that night. The next morning, Rios received a telephone call from Velez' wife or girlfriend, who informed him and the defendant that the police had a warrant for the defendant's arrest. On September 20, 2006, at approximately 8:30 p.m., the defendant returned to Waterbury, where he turned himself in at the front desk of the Waterbury police station.

Thereafter, the defendant was advised, in Spanish, of his *Miranda*[1] rights. He waived his rights to remain

---

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

silent and to have an attorney present, and willingly offered to tell his story to Detective George Tirado and Sergeant Michael Slavin. Although Tirado was able to communicate verbally with the defendant in Spanish, he was concerned about his ability to transcribe the defendant's written statement. Therefore, a state certified high school Spanish teacher, Yesenia Diaz, was called upon to transcribe the defendant's written statement in Spanish. After Diaz transcribed the statement in Spanish, she read the statement aloud to him and asked him if there was anything that he would like to change. She also had him read aloud some of the statement, just to make sure that he could read. The defendant reviewed the statement, stated that it was fine, affirmed it and signed it. Diaz then translated the statement into English and typed a copy in the English language. In his statement, the defendant admitted to shooting Rivera. The defendant further admitted that he had fired at Rivera because, as Rivera walked toward him, Rivera ignored his commands that Rivera remove his hands from his pockets and take off his hood.

The defendant was charged with murder. During his trial, the defendant testified and claimed that he had acted in self-defense. The jury, however, found him guilty of murder, and the court accepted the jury's verdict, rendered a judgment of conviction and sentenced the defendant to a term of fifty years incarceration. This appeal followed. Additional facts will be provided as necessary.

## I

The defendant claims that the court improperly refused to give a lesser included offense instruction on criminally negligent homicide. See General Statutes § 53a-58.[2] He argues that there was sufficient evidence

---

[2] General Statutes § 53a-58 (a) provides: "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle."

to sustain a conviction of criminally negligent homicide inasmuch as the evidence regarding his mental state was sufficiently in dispute, thereby permitting a jury to find him not guilty of the intentional act of murder but instead guilty of criminally negligent homicide. We disagree.

"[A] claim of instructional error with regard to the lesser included offense . . . requires us, on appeal, to review the facts in the light most favorable to the defendant. . . . Whether one offense is a lesser included offense of another presents a question of law. . . . Accordingly, our review is de novo." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 289 Conn. 742, 758, 961 A.2d 322 (2008).

"The applicable legal principles are well established. A defendant is entitled to an instruction on a lesser offense if . . . the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant [not guilty] of the greater offense but guilty of the lesser. *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980)." (Internal

Criminal negligence is defined in General Statutes § 53a-3 (14), which provides: "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ."

quotation marks omitted.) *State* v. *Jones*, supra, 289 Conn. 758–59.

The defendant's claim implicates all four prongs of *Whistnant*; accordingly, we address each prong in turn. "Under the first prong of *Whistnant*, a defendant is not entitled to an instruction on a lesser included offense unless it is requested." Id., 759. Here, the parties do not dispute that the defendant properly requested such an instruction. The record demonstrates that the defendant submitted a supplemental request to charge, asking the court to instruct on four lesser included offenses: the crime of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and (3), manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a), manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1) and criminally negligent homicide. The court gave instructions on two of the lesser included offenses, manslaughter in the first degree with a firearm and manslaughter in the second degree with a firearm. The court declined, in relevant part, to instruct the jury on criminally negligent homicide. This, the defendant argues, was error.

"Under the second prong of *Whistnant*, a defendant is entitled to the requested instruction if it was not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser [offense] . . . . [T]he relationship between the offenses is determined not by a comparison of statutory elements in the abstract . . . but by reference to the pleadings in the case. The key ordinarily is whether the allegations in the pleading charging the higher offense . . . include all of the elements of the lesser offense. . . . [T]he term offense, as it is used in *Whistnant*, refers to each distinct method, which may be comprised of different

elements, by which a crime may be completed." (Citations omitted; internal quotation marks omitted.) Id., 761. The parties do not dispute that the defendant has met the second prong of *Whistnant*. It is not possible for the defendant to have committed murder in the manner described in the information without having committed criminally negligent homicide, the distinguishing element between the two offenses being the defendant's state of mind. See *State* v. *Tomlin*, 266 Conn. 608, 630, 835 A.2d 12 (2003) (only element distinguishing murder from criminally negligent homicide is state of mind element).

With respect to the third and fourth prongs of *Whistnant*, the defendant argues that they "are subject to the same evidentiary analysis and therefore [that] it is appropriate to analyze them simultaneously." He argues that on the basis of the evidence, the jury reasonably "could have determined that [the] defendant responded instantaneously to what he believed to be a life-threatening event and [that] he did not perceive the risk of death from his actions." Accordingly, he argues, the jury could have found him not guilty of murder and guilty of the lesser charge of criminally negligent homicide. We are not persuaded.

Our Supreme Court has instructed that "[d]espite being conceptually distinct parts of the *Whistnant* formulation, the third and fourth prongs are subject to the same evidentiary analysis . . . [and, therefore, can be analyzed] simultaneously. The third prong of *Whistnant* requires that there [be] some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense . . . . The fourth prong requires that the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the

defendant [not guilty] of the greater offense but guilty of the lesser. . . .

"In *State* v. *Rasmussen*, [225 Conn. 55, 65–73, 621 A.2d 728 (1993)], we . . . reviewed the standard of evidence required to satisfy the [third and fourth prongs] of the *Whistnant* test. We . . . held that there must be sufficient evidence, introduced by either the state or the defendant, or by a combination of their proofs, to justify a finding of guilt of the lesser offense. . . . Although [we] expressly [reject] the proposition that a defendant is entitled to instructions on lesser included offenses based on merely theoretical or possible scenarios . . . we . . . consider the evidence available at trial in the light most favorable to the defendant's request. . . . [T]he jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested. . . . Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 289 Conn. 762–63.

A review of the evidence, viewed in the light most favorable to the defendant, leads us to the conclusion that the defendant's request to charge on the lesser offense of criminally negligent homicide was based on theoretical or possible scenarios rather than on a theory having a sufficient basis in the evidence. Cf. id. At trial, the defendant testified that he feared for his life because Rivera was coming toward him and ignoring his demands. He also testified that Rivera demanded money and drugs and that, when the defendant pushed Rivera away, he felt something hard in his pocket and thought it could be a gun. He contends that he reacted in response to these events by shooting Rivera but that he had no intent to kill him; he merely wanted to "stop him." The defendant asserts that his lack of intent to

kill Rivera is demonstrated by the fact that four of the eight gunshots missed Rivera and that, of the four that did hit him, "three of them were nonfatal wounds and were in parts of his body that were not life-threatening." We are not persuaded that this testimony was sufficient to warrant a charge on the lesser offense of criminally negligent homicide.

In his September 20, 2006 written statement to the police, the defendant admitted that he intended to shoot Rivera, and the evidence at trial showed that he was standing rather close to Rivera when he began firing at him. Three of the gunshots that hit Rivera entered Rivera's body from the rear. The medical examiner could not say definitively which of the gunshots that hit Rivera caused his death, but he opined that it likely was either the gunshot that entered his back and went through his heart and lung or the gunshot that entered through his left earlobe and went through his head exiting out of his right cheek. "One who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill. . . . A pistol . . . or gun is a deadly weapon per se." (Citation omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, supra, 225 Conn. 72. Here, even if the defendant feared for his life, the evidence demonstrated that, inter alia, he intended to shoot Rivera, he discharged eight bullets from his firearm and three of the four bullets that hit Rivera entered his body from the rear, he then handed his gun to a friend and he fled the scene and went to New York. On the basis of the evidence presented, viewed in the light most favorable to the defendant, we conclude that the defendant's assertions that he was entitled to an instruction on criminally negligent homicide because he did not intend to kill

Rivera is nothing more than an abstract theory or possible scenario of the type discussed and rejected in *Rasmussen.* After viewing the evidence most favorably to the defendant, we conclude that there was insufficient evidence to warrant a charge that the defendant had acted negligently in causing the death of Rivera.

## II

The defendant next claims that he "was deprived of a fair trial by the prosecutor's repeated and deliberate improprieties that occurred throughout the trial." He argues that the "prosecutor exceeded the bounds of acceptable conduct when he: (1) repeatedly commented on the guilt of [the] defendant and attempted to influence the jury by his persistent use of the terms 'victim,' 'murder,' and 'murder weapon' throughout the trial; (2) argued that to acquit [the] defendant, the jury would have to find that every other witness was wrong in violation of *State* v. *Singh,* 259 Conn. 693, [793 A.2d 226 (2002)]; (3) appealed to the jurors' passions and emotions; (4) denigrated the integrity of defense counsel in closing argument; and (5) attempted to influence the jurors about the credibility of his witnesses through improper means." He contends that he is entitled to a new trial. Although we agree that some of the conduct of the prosecutor was improper, we disagree that it deprived the defendant of a fair trial.

After setting forth the applicable standard of review, we will examine each of these allegations of improper conduct. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety]

caused or contributed to a due process violation is a separate and distinct question . . . .

"[T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . . Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. . . . Thus, the question in the present case is whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks. . . .

"We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. . . . [T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . [I]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has

no bearing on the issue before the jury, namely, the guilt or innocence of the defendant. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel. . . .

"The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . .

"[T]he state may argue [however] that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie." (Citations omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 81–83, 3 A.3d 1 (2010), cert. denied,     U.S.     , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

A

Whether the Prosecutor Committed
Improprieties

1

The defendant first contends that the prosecutor acted improperly when he "repeatedly commented on

the guilt of [the] defendant and attempted to influence the jury by his persistent use of the terms 'victim,' 'murder,' and 'murder weapon' throughout the trial . . . ." The defendant contends that the prosecutor referred to Rivera as the "victim" thirty-one times, referred to his death as "murder" five times, and referred to the firearm as the "murder weapon" eight times during closing argument. He directs us to similar occurrences during the prosecutor's questioning of trial witnesses where he alleges that the prosecutor referred to Rivera as the "victim" twenty-seven times, referred to his death as "murder" twelve times, and referred to the firearm as the "murder weapon" six times. We agree that in a case such as this, where the defendant has asserted a self-defense claim, it is improper for the prosecutor repeatedly to use the words victim, murder and murder weapon throughout the trial.

"The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 546, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

In his presentation of this argument, the defendant cites to several cases in which reviewing courts have held it improper for a trial judge to use the words "victim" or "murder" when giving jury instructions. See, e.g., *State* v. *Cortes*, 276 Conn. 241, 249 n.4, 885 A.2d 153 (2005); *State* v. *Santiago*, 100 Conn. App. 236, 253, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 152 (2007); *People* v. *Davis*, 73 App. Div. 2d 693, 693–94, 423 N.Y.S.2d 229 (1979); *People* v. *Orosco*, 73 Cal. App. 580, 239 P. 82 (1925). The defendant argues that it equally is wrong for a prosecutor to use such terms in the course of trial and closing argument where there is a claim of self-defense. Citing to *Santiago*, the

defendant argues that although "it was undisputed that Rivera was shot and killed, the disputed issue was whether [the] defendant committed murder or whether he acted in self-defense, and, as such . . . [i]f his conduct in shooting [Rivera] was justified, [Rivera] was not a victim of any crime at the defendant's hands." (Internal quotation marks omitted.) Essentially, he argues, if the jury credited his self-defense claim, there would have been no victim, no murder and no murder weapon in this case, and the prosecutor's use of those words, therefore, improperly implied to the jury that he believed the defendant was guilty. Under the circumstances presented here, we agree with the defendant.

The state cites, in part, to *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), and to *State* v. *Rodriguez*, 107 Conn. App. 685, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008), and argues that although it is improper for *the court* to refer to the decedent as "the victim"; see *State* v. *Cortes*, supra, 276 Conn. 249 n.4; it is not improper for *the prosecutor* to employ such terms during questioning and during closing argument. In *Warholic*, the defendant claimed that the prosecutor's two references to the complainant as "the victim" were improper, especially in light of the fact that the defendant had contested that a crime had occurred. *State* v. *Warholic*, supra, 369. Our Supreme Court, noting a clear distinction between the court's use of the word "victim," which is improper in such circumstances, and the prosecutor's use of the word, held that the use of this word by the prosecutor was not improper because the jury readily would understand that it "reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes." Id., 370. We note, however, that in *Warholic* the prosecutor's use of the word "victim" was made during closing argument, after the jury had heard the evidence, and it was an argument based on the

evidence. See *State* v. *Warholic*, 84 Conn. App. 767, 776, 854 A.2d 1145 (2004), rev'd, 278 Conn. 354, 897 A.2d 569 (2006).

In *State* v. *Rodriguez*, supra, 107 Conn. App. 701–702, the defendant had been charged with two counts of robbery in the second degree and one count of conspiracy to commit robbery in the second degree. The defendant testified during trial, and he asserted that no crime had been committed and that his interactions with the victim were related to a drug deal. In a motion in limine, the defendant requested that the court prohibit the prosecutor from using the word "victim" to describe the complainant during questioning of witnesses and closing argument. The court denied the request, and the prosecutor used the word "victim" a few times during trial. On appeal, the defendant claimed that the prosecutor's use of the word "victim" to describe the complainant was improper. We explained that there was an evidentiary basis for the jury to conclude that a crime had occurred in the case and, therefore, the use of the word "victim" was not improper. Id., 703. We further explained: "Jurors understand the respective roles of the prosecutor and defense counsel. It should not be assumed that jurors will be unduly influenced by the prosecutor's use of the word victim. We therefore conclude[d], under the facts of [that] case, that the prosecutor's reference to [the complainant] as the victim was appropriate, not the expression of a personal opinion, and did not constitute prosecutorial impropriety that denied the defendant a fair trial." Id. We went on to note, however, that the "prosecutor used the word victim sporadically when questioning two of the state's seven witnesses . . . [and that] the defendant concede[d] that the prosecutor's use of the word victim when examining the state's witnesses was not frequent." Id., 701–702. This court also concluded that the use of the word

victim during closing argument was not likely to confuse the jury because it was based on the evidence and was a proper form of rhetorical argument. Id., 703.

We conclude that the present case is distinguishable from both *Warholic* and *Rodriguez*. In the present case, the prosecutor repeatedly used the words "murder" and "murder weapon" in addition to the word "victim" throughout the entire trial. In *Warholic*, our Supreme Court clearly stated that the prosecutor's use of the word "victim" during closing argument was not improper because the jury would understand that it was based on evidence presented and on the state's argument that the defendant had committed the crimes charged. *State* v. *Warholic*, supra, 278 Conn. 370. An important factor in our Supreme Court's decision in *Warholic* was the fact that the prosecutor used the term "victim" during the course of closing argument, when the jury would understand that the prosecutor was using the word to argue, on the basis of the evidence that had been presented, that the state had proven its case. See id., 369–70. It was permissible rhetorical argument.

In *Rodriguez*, this court also concluded that the use of the word victim by the prosecutor during closing argument was nothing more than a permissible rhetorical device, based on the state's view of the evidence. *State* v. *Rodriguez*, supra, 107 Conn. App. 703. In analyzing the use of the word during witness questioning, however, this court concluded that the use was sporadic and, presumably, harmless. Id., 701–702.

We conclude that *Warholic* and *Rodriguez* are distinguishable from the present case. We are persuaded that, in a case where there is a challenge as to whether a crime occurred, the repeated use of the words victim, murder and murder weapon is improper. See *People* v. *Price*, 1 Cal. 4th 324, 480, 821 P.2d 610, 3 Cal. Rptr. 2d

106 (1991), cert. denied, 506 U.S. 851, 113 S. Ct. 152, 121 L. Ed. 2d 102 (1992); *Jackson* v. *State*, 600 A.2d 21, 24 (Del. 1991); *State* v. *Devey*, 138 P.3d 90, 95 (Utah App. 2006); see also *State* v. *Thompson*, 266 Conn. 440, 473, 832 A.2d 626 (2003).

In *People* v. *Price*, supra, 1 Cal. 4th 324, the defendant was convicted, inter alia, of two counts of first degree murder and was sentenced to death. The defendant argued, among his numerous claims on direct appeal, that the use of the word murder by a witness was improper. Id., 479. Despite the fact that the killing referred to as a "murder" was not one of the killings for which the defendant was standing trial at that time, the California Supreme Court explained in relevant part: "Although it would be improper for a prosecutor to use the term 'murder' in questioning a witness about an unadjudicated killing, a prosecutor is of course free to argue to the jury, after all the evidence had been presented, that it should find that a killing was murder." Id., 480.

In *Jackson* v. *State*, supra, 600 A.2d 23, the defendant claimed on appeal that the court committed plain error by, inter alia, permitting the prosecutor to use the word victim repeatedly when referring to the complaining witness while conducting his examination of certain law enforcement witnesses. The defendant had been charged, in part, with unlawful sexual intercourse in the first degree, but he claimed that the act had been consensual. Id., 22–23. He asserted for the first time on appeal, that because "consent was his sole defense, reference to a 'victim' assume[d] that a crime had been committed and the sexual acts were non-consensual. Thus, he argue[d] any reference to the complaining witness as 'the victim' convey[ed] to the jury a conclusion of guilt." Id., 24. The Supreme Court of Delaware stated: "The term 'victim' is used appropriately during trial when there is no doubt that a crime was committed

and simply the identity of the perpetrator is in issue. We agree with defendant that the word 'victim' should not be used in a case where the commission of a crime is in dispute." Id. The court, however, determined that "[t]he trial court, when it allowed the prosecutor to use the word 'victim,' did not commit plain error because the term 'victim,' to law enforcement officers, is a term of art synonymous with 'complaining witness.' Moreover, the term 'victim' is also used in the indictment in this case as it is routinely in criminal charges which are read to the jury. Although the term should be avoided in the questioning of witnesses in situations where consent is an issue, its use in this case, without objection, does not constitute plain error." Id., 24–25.

After the state filed a motion for clarification or rehearing en banc, the Supreme Court of Delaware, sitting en banc, further explained its decision in an amendment to the original decision; the court explained: "The [c]ourt's criticism was directed to a prosecutor's repeated use of the term ['victim'] in a case where consent was the sole defense, and the principal issue one of credibility, to suggest to the jury, that a crime necessarily had been committed. In this case, if the defense of consent were accepted by the jury, no crime would have been proven and the complaining witness would not be deemed a victim. In such cases it is incompatible with the presumption of innocence for the prosecutor to refer to the complaining witness as the 'victim,' just as it is to refer to the defendant as a 'criminal.' *Commonwealth* v. *Johnson*, 516 Pa. 527, 533 A.2d 994 (1987). In each instance, the use of a particular term assumes the commission of a crime. If there is no dispute that a crime has, in fact, occurred, there is no harm in referring to the existence of a victim. In a narrow range of cases, such as this, such use is clearly unwarranted. It is improper for a prosecutor to

assume as a given, or to suggest to the jury, the existence of that which is in dispute. It is a practice to be avoided, but, as the opinion emphasizes, in the absence of an objection it does not constitute plain error." *Jackson* v. *State*, supra, 600 A.2d 25.

In *State* v. *Devey*, supra, 138 P.3d 95, the defendant had been convicted of multiple sexual abuse crimes committed against his biological daughter. On appeal, the defendant alleged, inter alia, that he was prejudiced by a testifying witness' reference to the complainant as "the victim," which, he argued, deprived him of the presumption of innocence. Id. The court agreed that such references were improper: "We agree with [the defendant] that in cases such as this—where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the trial court, the [s]tate, and all witnesses should be prohibited from referring to the complaining witness as 'the victim.' " Id.

We also are guided by *State* v. *Thompson*, supra, 266 Conn. 473, a case in which our Supreme Court held that the prosecutor's repeated reference to the defendant as a "killer" was improper. The court explained: "It is no part of a [prosecutor's] duty, and it is not his right, to stigmatize a defendant. He has a right to argue that the evidence proves the defendant guilty as charged in the indictment, but for the [prosecutor] himself to characterize the defendant as a cold-blooded killer is something quite different. No [defendant] on trial for murder can be officially characterized as a murderer or as a cold-blooded killer, until he is adjudged guilty of murder or pleads guilty to that charge. . . . The prosecutor's repeated references to the defendant as a killer, therefore, were improper comments on the defendant's guilt." (Citations omitted; internal quotation marks omitted.) Id., 472–73.

In the present case, the prosecutor referred to Rivera as "the victim" approximately twenty-seven times, to the killing as a "murder" approximately twelve times and to the firearm as the "murder weapon" approximately six times during the evidentiary phase of the trial, and he similarly used those terms throughout closing argument. We conclude that such repeated references were improper. See *Jackson* v. *State*, supra, 600 A.2d 25; *State* v. *Devey*, supra, 138 P.3d 95. When there is no doubt that a homicide[3] occurred and that the defendant was the person who caused it to occur, and the only question for the jury is whether the homicide was justified, the prosecutor's repeated reference to the "victim," the "murder" and the "murder weapon" amounts to an opinion on the ultimate issue of the case. We conclude, therefore, that the prosecutor's repeated use of these words was improper in this case.

2

The defendant next contends that the prosecutor violated *State* v. *Singh*, supra, 259 Conn. 693, when he argued that in order to acquit the defendant, the jury would have to find that every other witness "was wrong." He argues that there is "no distinction between a prosecutor using the word 'wrong' or 'mistaken' instead of 'lying'—all are equally improper." The state argues that there is a distinction when such words are used during closing argument. We agree with the defendant.

In *Singh*, our Supreme Court explained that it "previously ha[d] not had the opportunity to address the well established evidentiary rule that it is improper to

---

[3] "Homicide" is defined as "[t]he killing of one person by another." Black's Law Dictionary (9th Ed. 2009). Black's also explains: "The legal term for killing a [person], whether lawfully or unlawfully, is 'homicide.' There is no *crime* of 'homicide.' Unlawful homicide at common law comprises the two crimes of murder and manslaughter." (Emphasis in original.) Id., quoting G. Williams, Textbook of Criminal Law (1978) 204.

ask a witness to comment on another witness' veracity. See, e.g., *United States* v. *Sanchez,* 176 F.3d 1214, 1219–20 (9th Cir. 1999); *United States* v. *Gaines,* 170 F.3d 72, 81 (1st Cir. 1999); *United States* v. *Lin,* 101 F.3d 760, 769 (D.C. Cir. 1996); *United States* v. *Scanio,* 900 F.2d 485, 493 (2d Cir. 1990); *Knowles* v. *State,* 632 So. 2d 62, 65–66 (Fla. 1993); *People* v. *Riley,* 63 Ill. App. 3d 176, 184–85, 379 N.E.2d 746 (1978); *State* v. *Manning,* 270 Kan. 674, 19 P.3d 84, 103 (2001); *Commonwealth* v. *Martinez,* 431 Mass. 168, 177, 726 N.E.2d 913 (2000); *State* v. *Flanagan,* 111 N.M. 93, 97, 801 P.2d 675 (App. 1990); *Burgess* v. *State,* 329 S.C. 88, 91, 495 S.E.2d 445 (1998); *State* v. *Emmett,* 839 P.2d 781, 787 (Utah 1992); *State* v. *Casteneda-Perez,* 61 Wn. App. 354, 362, 810 P.2d 74 (1991). A few of these courts have drawn a distinction between using the words wrong or mistaken rather than lying in questions and closing arguments, concluding that the former terms are not improper because they merely [highlight] the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a liar. *United States* v. *Gaind,* 31 F.3d 73, 77 (2d Cir. 1994); see also *United States* v. *Gaines,* supra, 82 (use of word wrong proper in present case but court declines to address whether it would be in all instances); but see *State* v. *Flanagan,* supra, 97 (asking if another witness is mistaken is improper because it may amount to simply argument to the jury, in which the prosecutor improperly suggests that the only possible alternatives are that either the defendant or the witness is a liar)." (Internal quotation marks omitted.) *State* v. *Singh,* supra, 259 Conn. 706–707.

The court further explained: "Several reasons underlie the prohibition on such questions. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another

witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. . . .

"Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason. . . .

"Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; internal quotation marks omitted.) Id., 707–10.

In the present case, during closing argument the prosecutor told the jury that "in order for you to find the defendant not guilty of the crime of murder, you have to find that everybody is wrong in this case. The police are wrong. The detectives who interviewed him are wrong. The defendant's own friends and associates are wrong. Ms. Yesenia Diaz is wrong, the interpreter.

Right? And almost incredibly, you've got find that the defendant's own statement is wrong, that he was wrong, because he didn't tell the cops that he acted in self-defense. You can't do that. You can't do that." During rebuttal argument, the prosecutor similarly argued: "Ladies and gentlemen, in order for you to find the defendant not guilty you have to find that every single person in this case is wrong."

Although the state argues that saying to the jury that all the witnesses are wrong is not the same as saying that the jury would have to find that they all lied, guided by our Supreme Court's decision in *Singh*, we disagree. In *Singh*, our Supreme Court very clearly stated that it would not "make [a] distinction between using the word wrong as opposed to lying. . . . Although questioning whether a witness' testimony is wrong may, at first blush, seem less egregious, we conclude that it is none-theless improper because it requires the witness to characterize testimony and may lead to the same problematic results." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 712 n.16. We are not persuaded that this conclusion is any less relevant to closing argument than to witness examination.

Thus, we conclude that arguments to the jury that it must find that all of the witnesses other than the defendant were wrong in order to conclude that the defendant is not guilty are improper. In this case, because the prosecutor did just that, we conclude that his comments were improper.

3

The defendant next claims that the prosecutor acted improperly during closing argument when he appealed to the jurors' passions and emotions by injecting allegations that had nothing to do with the defendant's guilt or innocence. In particular, the defendant cites to the

following statements made by the prosecutor: "When you look at the victim in this photograph—it's in the indignity of death, isn't it? Right? But what you see there is a human being. . . . [T]here's been nothing presented in this case that would justify the defendant taking that nine millimeter pistol and executing him. Nothing. . . . Rivera can't speak to you today, and he can't tell you what he saw in the moments before the first bullet tore into his body. He can't tell you which bullet hit him first." He also cites to the following statement made by the prosecutor during rebuttal argument: "[W]hen [Rivera] went up the steps on that fatal night, he was alone. He was all alone. The defendant had his crew behind him or his team. And in a few minutes, ladies and gentlemen, [Rivera] won't be alone anymore because you're going to get this case." He further cites to the prosecutor's direction to the jury to "[l]ook at the evidence in this case. Hold the state to [its burden]. But if you do that, and do your duty as jurors, there's only one conclusion you can reach . . . murder and that it was not justified." The state contends that reviewed in the context in which these statements were given, they were not improper. We agree with the state.

It is well established that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 376.

Each of the challenged statements, read in the context in which they were given, reveals that the prosecutor told the jury that it must base its verdict on the evidence and that the state bore the burden of proof. The statements also were tied to the evidence and the

reasonable inferences drawn from that evidence. We conclude that the statements were not improper.

## 4

The defendant next argues that the prosecutor acted improperly by denigrating the integrity of defense counsel during closing argument. In particular, the defendant challenges the following rebuttal statements: "Do you know how the octopus protects itself in the water? It shoots out ink into the water. Do you know what happens when you shoot out the ink? The water gets muddy and the octopus swims away. That's what [is] being attempted here. Defense counsel wants you to focus on the police. She wants me to say that the police aren't on trial. Evaluate the police officers' conduct. You should. Absolutely, you should. But don't lose sight [of] the fact for one second that the defendant [is] on trial. And every moment that you spend evaluating other people's conduct is time that you're not spending evaluating the defendant's conduct, and that's called a shotgun approach. You shoot it against the wall and you hope that something will stick." The defendant argues that several courts from other jurisdictions have held this type of argument improper. The state argues that we previously have held that statements made during closing argument, telling the jury to focus on the evidence and to not be fooled by defense counsel's arguments, are not improper and that this, essentially, is what the prosecutor did in this case. We agree with the state.[4]

---

[4] The state also points to *State* v. *Williams*, 81 Conn. App. 1, 17, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004), in which we held that similar language was not improper. In *Williams*, the prosecutor had argued: "I still didn't hear how an eight year old got confused about this. You heard a lot of things from defense counsel, and what it made me think of was, if you've ever been outside and looked into a clear stream—a crystal clear stream, you can see the bottom—you can see fish swimming around it. What happens when you throw a rock in that stream? You throw it down hard and mud comes up; you can't see the water, you can't see the bottom, you can't see the fish. They're still there. Focus on the evidence. Use your

As stated previously: "[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . [I]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials . . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *Outing*, supra, 298 Conn. 82–83.

Reviewing the prosecutor's comments in context, we conclude that the challenged remarks fell within the bounds of proper commentary. The prosecutor asked the jurors to review and evaluate the conduct of the police and of the defendant and to focus on the evidence. Although some of the language employed may have been ill-advised, we conclude that the prosecutor's statements did not denigrate the integrity of defense counsel.

5

The defendant also claims that the prosecutor acted improperly by attempting to influence the jury's assessment of the credibility of his witnesses and by inserting his personal knowledge into the case. First, the defendant claims that the prosecutor improperly asked several of the state's witnesses on direct and redirect examination if they were telling the truth or if they were prepared to tell the truth in an attempt to bolster or rehabilitate the credibility of these witnesses before

good common sense. Clear through that and focus on what's important in this case." (Internal quotation marks omitted.) Id., 16.

they were impeached. Second, the defendant claims that the prosecutor inserted his own knowledge into the case in an effort to bolster the credibility of Carlos Ayala, a jailhouse informant. We will consider each of these claims.

a

First, the defendant claims that the prosecutor improperly asked several of the state's witnesses on direct examination and on redirect examination if they were telling the truth or if they were prepared to tell the truth. This, he argues, was an attempt by the prosecutor to bolster or rehabilitate the credibility of these witnesses before the witnesses were impeached. The state argues that each of the witnesses had testified that they had pending criminal cases and that they did not want to testify in the present case. The questions posed relating to their truthfulness, it argues, merely were attempts to confirm that despite their reluctance to testify, they still were prepared to tell the truth.[5] We conclude that the questions posed on direct examination were improper attempts at bolstering the witnesses.

"Evidence that bolsters a witness' credibility before it has come under attack is prohibited. Conn. Code

[5] In support of its argument, the state relies on footnote 10 of *State* v. *Vazquez*, 79 Conn. App. 219, 231, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003), in which we stated: "The defendant additionally claims that the prosecutor invited several state's witnesses to comment on their own credibility. We interpret the remarks in question as inquiries into their potential motivation for lying and their awareness of the ramifications of not telling the truth. We have long held that '[a]n important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959).' . . . *State* v. *Privitera*, 1 Conn. App. 709, 712, 476 A.2d 605 (1984). We conclude that this is equally true of direct examination. Those questions, therefore, were not improper." *State* v. *Vazquez*, supra, 231 n.10. The *Vazquez* opinion does not recite the questions asked by the prosecutor, however. We, therefore, are unable to determine its relevance to the case at bar.

Evid. § 6-11 (a); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.27.2 (a), p. 342 (discussing prohibition of '[e]vidence accrediting or supporting a witness's honesty or integrity [before] the witness's credibility has first been attacked')." *State* v. *Juan V.*, 109 Conn. App. 431, 439, 951 A.2d 651, cert. denied, 289 Conn. 931, 958 A.2d 161 (2008). "A witness may be asked on direct examination questions necessary to lay a foundation for the later admission of other evidence, even if such foundation questions might appear to accredit the witness. Such use does not violate the general rule that accreditation before impeachment is improper. [Id., 431]. In *Juan V.*, in order to lay a foundation for the introduction of a video-tape interview under the [rule of *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)], the prosecution was allowed to ask victim if she knew she was supposed to tell the truth during the video-taped interview. The court rightly contrasted that proper question with the improper question whether she was in fact telling the truth. Id. at 439–441." C. Tait & E. Prescott, supra, p. 49 (Cum. Sup. 2010).

In this case, the defendant points to three instances during direct examination in which he alleges that the prosecutor improperly attempted to bolster the credibility of three different witnesses and to two instances where he attempted to bolster witnesses' credibility during redirect examination.[6] Our review of these questions leads us to the conclusion that the prosecutor

---

[6] The defendant first points to the prosecutor's direct examination of Andres Deleon, in which he asked:

"Q. Okay. So, you remember telling the police how [the defendant] was dressed?

"A. Okay.

"Q. Mr. Deleon, you don't want to be here today, do you?

"A. I've got no choice.

"Q. Are you going to tell the truth?

"A. Yeah, I'm telling the truth."

The defendant next points to the prosecutor's direct examination of Luis Rios, in which he asked:

improperly attempted to bolster the credibility of several of the state's witnesses. See *State* v. *Juan V.*, supra, 109 Conn. App. 439–41; C. Tait & E. Prescott, supra, pp. 342–43.

b

The defendant next claims that the prosecutor inserted his own knowledge into the case in an effort to bolster the credibility of Ayala, a jailhouse informant.[7]

"Q. Has anyone threatened you in any way from the state's attorney's office?

"A. No, sir.

"Q. Or from the Waterbury police department?

"A. No, sir.

"Q. Mr. Rios, are you prepared to testify honestly and to the best of your recollection today?

"A. Yes, sir."

The prosecutor also asked Rios during direct examination: "Have you told the truth today?" Rios responded: "Yes, sir."

The defendant further cites to the prosecutor's direct examination of Jose Velez, in which he asked:

"Q. It's also been explained that there [are] no promises, [there are] no offers of leniency if you testify in front of this jury today. Are you aware of that?

"A. Yeah.

"Q. Are you prepared to tell the truth about what occurred between you and [the defendant] on or about September 18 and 19 of 2006?

"A. Yes."

The defendant directs us to two instances of alleged bolstering during redirect examination. The first is alleged to have taken place during the prosecutor's redirect examination of Rios, in which the prosecutor asked Rios:

"Q. Has your testimony today been truthful?

"A. Yes."

The next instance allegedly occurred during redirect examination of Ayala when the prosecutor asked:

"Q. The jury needs to know, did you have a conversation with [the defendant]?

"A. Yes, sir. . . .

"Q. Have you testified truthfully to that conversation?

"A. Yes, sir."

[7] Specifically, the defendant argues that the following questioning was improper:

"Q. What made you want to bring this to the attention of the state's attorney's office or to law enforcement in general?

Specifically, he argues: "Instead of actually questioning Ayala, the prosecutor used his questions as a vehicle to get before the jury facts about his own understanding of what Ayala would receive, thereby demonstrating that Ayala was credible." The state argues that Ayala already had testified to the fact that he had received no promises in exchange for his testimony and that, therefore, this line of questioning was based on evidence already before the jury and was not an attempt by the prosecutor to insert his own knowledge into the case. We agree with the state.

"A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 809, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

Before posing the questions of which the defendant complains; see footnote 6 of this opinion; the prosecutor asked Ayala about all the criminal charges he had pend-

---

"A. Maybe it could help my case.

"Q. So, that's what you hoped was going to happen?

"A. Yes, sir.

"Q. Again, I'm going to tell you, because if you want to change your story, go ahead and change it, there's no promises to you. Okay? Period and end of story. Now, do you understand that?

"A. Yes, sir.

"Q. That's one thing to hope that something's going to happen, and it's another thing to be told or expected. Did anybody give you any reason to expect something good is going to happen with all your charges.

"A. No, sir."

ing, including "some pretty serious charges." The prosecutor also asked him about his prior convictions and the fact that he was on probation at that time. The prosecutor then asked Ayala to explain how he had come in contact with the state's attorney's office regarding the defendant's case. After Ayala explained that he had contacted the state's attorney's office and had met with a representative from that office, the prosecutor asked him if he or anyone "from the state's attorney's office ever discuss[ed] that [he] would get any benefit from testifying in court today?" Ayala responded: "No, sir." The prosecutor then asked: "All right. What were you told about if you testified? Explain to the jury in your own words:

"A. Nothing is promised.

"Q. Did I even discuss your cases?

"A. No, sir."

Our review of the transcript reveals that the information concerning whether Ayala had been promised any benefit in exchange for his testimony was before the jury before the prosecutor asked the questions that the defendant now claims were improper interjections of personal knowledge. Accordingly, we reject the claim.

B

Whether the Improprieties Deprived
The Defendant of a Fair Trial

Having determined that prosecutorial improprieties were present in the defendant's case, we now proceed to determine whether the prosecutor's violations deprived the defendant of a fair trial by analyzing those violations in accordance with the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). "These factors include the extent to which the

[impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Internal quotation marks omitted.) *State v. Outing,* supra, 298 Conn. 80.

Applying the first *Williams* factor; see *State v. Williams,* supra, 204 Conn. 540; we conclude that the improprieties were not invited by defense conduct or argument. Considering the second of the *Williams* factors, the severity of the improprieties; see id.; we conclude that the improprieties were not severe. In this case, the prosecutor repeatedly used the words 'victim,' 'murder,' and 'murder weapon' throughout the trial, he violated *State v. Singh,* supra, 259 Conn. 693, by arguing that in order to acquit the defendant, the jury would have to find that every other witness "was wrong" and he improperly attempted to bolster the testimony of several witnesses by asking them if they were telling the truth. Reviewing these improprieties in light of our Supreme Court precedent; see, e.g., *State v. Thompson,* supra, 266 Conn. 479; we conclude that they were not severe.

In *Thompson,* our Supreme Court found several instances of improper conduct on the part of the prosecutor, including his repeated references to the defendant as a " 'killer' "; id., 472; his description of the testimony of the defendant's two principal witnesses as " 'reprehensible' "; id., 461; his statements to the jury that those witnesses were " 'lying' "; id., 467; and that they lacked both " 'moral fortitude' " and " 'conscience' "; id., 461; his statements to the jury that the defendant's witnesses lived in a " 'twisted world'," were not " 'stand-up enough guy[s]' " and that they had " 'reserved a place in hell for themselves' "; id.; and his argument to the jury that to believe the trial testimony

of the defendant's witnesses, the jury had to believe that the state's witnesses had lied. Id., 469–70. We conclude that in the present case, the prosecutor's conduct was less severe than that of the prosecutor in *Thompson*. Accordingly, employing the *Thompson* standard, as we must, we conclude that the improprieties were not severe.

Applying the third *Williams* factor, we consider the frequency of the improprieties. See *State* v. *Williams*, supra, 204 Conn. 540. Although we have determined that there were several instances of prosecutorial impropriety in this case, we cannot say that they were frequent. The defendant's trial lasted nearly two weeks and takes up more than one thousand pages of transcript. The instances of improper prosecutorial conduct were infrequent when compared to the entirety of the trial.

We next consider the fourth *Williams* factor, the centrality of the improprieties to the critical issues in the case. See id. The defendant argues that "the prosecutor attempted to obtain a conviction by having the jury consider not the evidence and the charge, but instead, by persistently characterizing [the] defendant's actions as murder and Rivera as a victim, by bringing in sympathy for Rivera and [by] inflaming the jurors' passions, by repeatedly emphasizing that his witnesses were credible, by denigrating defense counsel and by arguing that every single witness was lying if [the] defendant was innocent." The state concedes that "the alleged improprieties affected the central issue in this case, which was whether the defendant murdered the victim or acted in self-defense, but not significantly so." We conclude that the improprieties were central to the critical issues of the case.

We next look to the strength of the curative measures adopted by the court. See *State* v. *Williams*, supra, 204

Conn. 540. In this case, the defendant failed to object to any of the improprieties, or otherwise to call them to the attention of the court, and the court did not adopt, nor have the opportunity to consider whether to adopt, specific curative measures. Our Supreme Court determined in *Thompson* that defense counsel has a responsibility to call perceived prosecutorial improprieties to the attention of the court: "[T]he defendant, by failing to bring [the instances of impropriety] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . [that] clearly exists and clearly deprive[s] the defendant of a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 483–84.

We also are mindful of the fact that although the court gave no specific curative instructions, it specifically did instruct the jury during its general instructions: "You are the sole judges on the facts. It is your duty to find the facts. You are to recollect and weigh the evidence

and form your own conclusions as to what the ultimate facts are. You may not go outside the evidence introduced in court to find the facts. This means that you may not resort to guesswork, conjecture or suspicion, and you must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. . . .

"In reaching your verdict, you should consider all the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. These include . . . [a]rguments and statements by lawyers. . . . In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none, or any part of a witness' testimony. . . .

"In this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. . . . The burden to prove the defendant guilty of the crime with which he is charged is upon the state. The defendant does not have to prove his innocence." The court also gave a thorough instruction on the defendant's claim of self-defense.

There is no indication that the jury did not follow the instructions of the court. "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 485. Accordingly, although the court did not provide specific curative instructions, it did provide general guidance to the jury, which we presume, in the absence of any indication otherwise, that the jury followed.

The final *Williams* factor that we must consider is the strength of the state's case. See *State* v. *Williams*,

supra, 204 Conn. 540. In this case, the jury had before it evidence that the defendant shot Rivera in front of persons who witnessed the entire incident and that he admitted that when he fired the gun he intended to shoot Rivera. He fired eight gunshots from close range, four of which hit Rivera, with three of the four gunshots entering Rivera's body from the rear. After the shooting the defendant ran upstairs and gave the firearm to his friend, Garcia, and then left the scene. The defendant removed the red T-shirt he had been wearing and discarded it into some bushes. He later telephoned his friend, Velez, telling Velez that he needed to get away because he had shot someone. Velez, who had planned on going to New York, offered the defendant a ride, which he accepted. During the ride, the defendant told Velez and the other men in the vehicle, Rios and Gonzalez, that he had shot a man on Locust Street because the man would not respond to his orders. He did not remain to help Rivera. His behavior after the shooting is consistent with consciousness of guilt. See *State* v. *Gordon*, 104 Conn. App. 69, 85, 931 A.2d 939, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007). Also, in his September 20, 2006 statement to the police, the defendant admitted to shooting Rivera. The defendant further admitted that he had fired at Rivera because, as Rivera walked toward him, Rivera ignored his commands that Rivera remove his hands from his pockets and take off his hood. This evidence leads us to conclude that the state's case was strong.

Although we do not condone the prosecutor's improper comments in this case, on the basis of our assessment of these comments, analyzed in the context of the entire trial, we cannot conclude that the defendant was denied the right to a fair trial.

### III

The defendant next claims that the court improperly instructed the jury on the meaning of reasonable doubt,

which misled the jury.[8] The defendant argues that the instruction was constitutionally infirm and, in the alternative, that it was plain error. Specifically, he claims that the following excerpt from the court's oral charge misled the jury: "The meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel *which is warranted* by the evidence."[9] (Emphasis added.) The defendant argues that the import of the court's instruction was that "doubts raised by defense counsel even if warranted by the evidence are not reasonable doubts . . . ." Although we agree that the court's oral reading of this instruction was incorrect, we conclude that it is not reasonably possible that the jury was misled.

"[A]n erroneous charge is not always harmful. . . . An isolated error in an instruction may be cured by other portions of the charge . . . . We have often said that the charge should be read as a whole in determining whether it is reasonably possible that an erroneous instruction could have misled a jury concerning the state's burden of proof. It is well established . . . that individual instructions are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error." (Citations omitted; internal quotation marks omitted.) *State* v. *McDonough*, 205 Conn. 352, 356, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988).

The day before giving its final instructions to the jury in this case, the court handed written jury instructions

---

[8] The defendant did file a request to charge with the court, which included language on the meaning of reasonable doubt.

[9] The word "not" before the word "warranted" was inadvertently omitted from the court's oral reading of the instruction.

to both defense counsel and the prosecutor. The written instructions provided, in relevant part: "The meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel which is *not* warranted by the evidence." (Emphasis added; internal quotation marks omitted.) The next day, as the court prepared to read its instructions to the jury, it asked that the lights of the courtroom be dimmed, and it projected the written instructions onto the wall so that the members of the jury could follow along as the instructions were read out loud. Although the transcript indicates that the court left out the word "not" from its oral reading of the instructions, the written instructions themselves reveal that the word "not" was included in the written form of the instructions, which the jury had the opportunity to see as the court was reading them aloud. Additionally, the written form of the instructions, with the correct wording, was given to the jury for its consideration during deliberations.

On appeal, the defendant claims only that the omission of the word "not" from the court's oral reading of the instructions rendered the entirety of the instructions on reasonable doubt misleading. On the basis of the record before us, considering the instructions as a whole, as well as the fact that the jury had the correct written instructions available during deliberation and had those same correct written instructions projected on the courtroom wall during the court's reading of those instructions, we conclude that it is not reasonably possible that the jury was misled.

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

MIHALAKOS, J., concurring. I agree with the majority that the judgment of the trial court should be affirmed.

I respectfully write separately because I am not persuaded by the majority's conclusion that the prosecutor violated *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), when he argued that in order to find the defendant, Jonathan Albino, not guilty, the jury would have to find that every other witness was "wrong."

During the prosecutor's closing argument to the jury, he stated: "[I]n order for you to find the defendant not guilty of the crime of murder, you have to find that everybody is wrong in this case. The police are wrong. The detectives who interviewed him are wrong. The defendant's own friends and associates are wrong. Ms. Yesenia Diaz is wrong, the interpreter. Right? And almost incredibly, you've got to find that the defendant's own statement is wrong, that he was wrong, because he didn't tell the cops that he acted in self-defense. You can't do that."

During his rebuttal argument, the prosecutor stated: "[Y]ou all indicated that you have a strength in judging the credibility of the witnesses. Some of you have indicated that that's a personal strength of yours. Now is the time. Ms. Yesenia Diaz is a window for you into the interview room. If you find that she's not credible, then you find the defendant's version credible, because they're in complete conflict, aren't they? They're in conflict. Ladies and gentlemen, in order for you to find the defendant not guilty you have to find that every single person in this case is wrong."

In *Singh*, our Supreme Court held that it is improper to ask a witness to comment on another witness' veracity, in large part because determining the credibility of witnesses is solely within the province of the jury. As the court concluded in that case, "[t]herefore, we reject the state's invitation to carve out an exception to the rule that a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong.

Moreover, closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." *State* v. *Singh*, supra, 259 Conn. 712. In its conclusion, the court specifically drew a distinction between the questioning of a witness and statements of counsel during closing argument in the present case. The threat that a jury would be improperly influenced by a prosecutor's argument is greatly reduced as compared to direct testimony from a witness concerning another witness' veracity.

In this case, during his closing argument, the prosecutor stated that the jury would have to find several testifying witnesses to be "wrong" in order for the jury to find the defendant not guilty. Essentially, the prosecutor's statements were intended to convey that the jury was faced with testimony by the defendant that conflicted with the testimony of other witnesses and, in fact, the defendant's own written statement that was in evidence. See *State* v. *Stevenson*, 269 Conn. 563, 584, 849 A.2d 626 (2004) (it is not improper for a prosecutor to argue that defendant's testimony is " 'totally unbelievable' " when "it was a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn without access to the assistant state's attorney's personal knowledge of the case").

I concur in affirming the judgment of the trial court.