******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom ZARELLA and ESPINOSA, Js., join, concurring in the judgment. I agree with the majority that the judgment of conviction should be affirmed. I disagree, however, with the majority's conclusion in part II of its opinion that certain conduct and statements by the prosecutor during closing argument and cross-examination were improper. In particular, I am not persuaded that the senior assistant state's attorney (prosecutor) impermissibly (1) appealed to the jurors' emotions, passions and prejudices, (2) impugned defense counsel by suggesting that a focal point of the defense was to muddy or obscure the evidentiary waters, (3) bolstered the credibility of a state's witness, (4) argued that, to find the defendant, Jonathan Albino, not guilty, the jury was required to find that the testimony of the state's witnesses was "wrong," and (5) argued that, under the circumstances, the jury had a duty to find the defendant guilty. I therefore concur in the judgment.[1]

This court recently has reiterated the standards applicable to appellate review of claims alleging prosecutorial impropriety during cross-examination and closing argument. "Prosecutorial [impropriety] . . . may occur in the course of [examining] witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties . . . either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611, 65 A.3d 503 (2013).

"[P]rosecutorial [impropriety] of a constitutional magnitude can [also] occur in the course of closing arguments." (Internal quotation marks omitted.) Id. "[T]he prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek[s] impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [over] jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules [that] the laws prescribe. While the privilege of counsel in addressing the

jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) Id., 612.

"When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) Id., 611.

"Finally . . . the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) Id., 612. "Moreover . . . defense counsel may elect not to object to arguments [or questions during examination] that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to [them] or because he or she wants to later refute that argument [or line of questioning]." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 597, 849 A.2d 626 (2004). Applying these standards to the conduct of the prosecutor in the present case, the majority concludes that the prosecutor acted improperly in several respects. I disagree because I believe that the majority fails to consider the challenged conduct in context and, in so doing, fails to afford the prosecutor adequate leeway in advocating on behalf of the state.

Before identifying my specific points of disagreement with the majority, it bears emphasis that defense counsel did not object to *any* of the statements that the majority deems improper. As I noted, this fact plays a significant role in our analysis because we reasonably may infer that defense counsel did not view the comments as objectionable or detrimental when they were

made. It also is important to note that, with one exception, the Appellate Court determined that the challenged comments by the prosecutor were not improper.[2] See *State* v. *Albino*, 130 Conn. App. 745, 769–72, 777, 24 A.3d 602 (2011). For the reasons that follow, I believe that the Appellate Court's analysis and conclusions are more consistent with the principles that govern our review of claims of prosecutorial impropriety than the analysis and conclusions of the majority.

I turn first to the majority's determination that certain of the prosecutor's references to the victim, Christian Rivera, improperly appealed to the jurors' emotions "in that they either focused on factors that had nothing to do with the defendant's guilt or innocence or [involved] overly dramatic language."[3] Text accompanying footnote 2 of the majority opinion. One such alleged reference involved the following argument by the prosecutor: "No one asks you to forgive the life that William Ramos [a key state's witness and eyewitness to the victim's shooting] has led. But are you prepared to say that if a man commits *murder in cold blood* in front of a witness who has a criminal record . . . he can walk away because the witness has a felon[y] record? Are you prepared to say that?" (Emphasis added.) Subsequently, the prosecutor stated: "If . . . Rivera used drugs, if he sold drugs and he [was] arrested and convicted, he should go to jail for that. But there's been nothing presented in this case that would justify the defendant taking that nine millimeter pistol and *executing him*." (Emphasis added.)

According to the majority, it was improper for the prosecutor to characterize the defendant's killing of Rivera as an execution and a "murder in cold blood" in view of the fact that the evidence adduced by the defense "was deemed sufficient to warrant jury instructions on lesser included offenses inconsistent with a wholly unprovoked act of brutality that has been deemed by courts to justify the use of such terms." Part II A 1 of the majority opinion. In reaching this conclusion, the majority ignores the fact that, although the defendant *claimed* that he had killed the victim in self-defense, the state maintained—and the evidence was more than sufficient to establish—that the defendant had simply gunned down the unarmed and otherwise helpless victim, shooting him multiple times from behind. In arguing to the jury, the prosecutor was entitled to present the state's view of the evidence, and because the evidence fully supported a finding that the defendant murdered the victim in cold blood, more or less execution style, the prosecutor's argument to that effect was not improper.[4] Indeed, there was no dispute that the defendant shot and killed the victim; the only issue was his intent in doing so. In such circumstances, it is unreasonable to bar the prosecutor from characterizing the murder as the state perceived it: a heartless and wholly unjustified killing that was tantamount to

an execution.

The majority also takes issue with the following portion of the prosecutor's closing argument: "Now . . . one of the most difficult things about this case, or about any murder case, is the fact that you don't know anything about the victim. The defense put in today two misdemeanor convictions [of the defendant]. You don't know anything about that. When you look at the victim in this photograph, *it's in the indignity of death, isn't it*? Right? But what you see there is a human being." (Emphasis added.) The prosecutor then argued that the victim should have been punished if he was found guilty of using or dealing drugs but that any such criminal misconduct by the victim did not justify his being shot and killed. The majority condemns the prosecutor's comment "regarding 'the indignity of death' when showing the jury [the victim's] autopsy photograph," reasoning that, "[b]ecause the lack of dignity in [the victim's] appearance has no relevance to the issues in the present case, this statement would seem [to be] calculated solely to appeal to the jurors' emotions." Text accompanying footnote 3 of the majority opinion. It seems to me, rather, that the prosecutor's comment merely was intended to underscore the fact that, although the jury knew little or nothing about the victim except that he may have been a drug user or dealer, that he had a criminal record and that he suffered a violent death, the jury should not forget that the victim also was a human being who did not deserve to die at the hands of the defendant. In any event, the prosecutor's comment was innocuous and, in my view, cannot fairly be characterized as improper.[5]

The majority next concludes that it was improper for the prosecutor to assert, during rebuttal closing argument, that the jury should not be confused or distracted by the defense strategy of accusing the police of coercing several state witnesses to provide statements contradicting the defendant's claim of self-defense. This argument is as follows: "Now . . . like the legal shows that we talked about, there's a lot of animal dramas on [television], right? About a year ago, there was this show about the creatures of the deep, and they had talked about sharks, they talked about dolphins and all the different ways that animals protect themselves in the water. They had one, and it was very interesting; it was an octopus. Do you know how the octopus protects itself in the water? It shoots out ink into the water. Do you know what happens when you shoot out the ink? The water gets muddy, and the octopus swims away. That's what's being attempted here. Defense counsel wants you to focus on the police. She wants me to say that the police aren't on trial. Evaluate the police officers' conduct. You should. Absolutely, you should. But don't lose sight [of] the fact for one second that the defendant's on trial. And every moment that you spend evaluating other people's conduct is time that

you're not spending evaluating the defendant's conduct, and that's called a shotgun approach. You shoot it against the wall, and you hope that something will stick."

Specifically, the majority concludes that the prosecutor engaged in impropriety, first, by analogizing the strategy of the defense to an octopus' defense of shooting ink into the water and, second, by referring to the defense strategy as a "shotgun approach. You shoot it against the wall, and you hope that something will stick." The majority maintains that this argument was improper because it suggested that defense counsel "employed tactics [that were] intended to mislead the jury," thereby impugning his integrity. Text accompanying footnote 4 of the majority opinion.

With respect to the prosecutor's octopus analogy, I do not agree that the argument, as it was used in the present case, was improper. It was fair argument for the prosecutor to assert that, in the state's view, the defense strategy of accusing the police of misconduct was merely an effort to divert the jury's attention from the real issue in the case, namely, the reason why the defendant shot and killed the victim. The reference to an octopus muddying the water by shooting ink into it is a colorful one, but the prosecutor linked the reference directly to a primary theory of the defense, namely, that the police had coerced false statements from several key witnesses in order to dispel the defendant's claim of self-defense, and then reasonably characterized that defense theory as an attempt to focus the jury on the conduct of the police and away from the conduct of the defendant. Although I agree that the octopus analogy would be inappropriate if untethered to the specific facts of the case, the prosecutor's use of the analogy in the present case was a legitimate means of explaining why, in the view of the state, the defense had sought to impugn the integrity of the police. At the same time, moreover, the prosecutor was careful to urge the jury to evaluate the conduct of the police as well as the conduct of the defendant.

I also do not agree with the majority that the octopus analogy, at least as it was presented to the jury, is "effectively similar" to the term "smoke and mirrors"; part II A 2 of the majority opinion; which this court has disapproved. See, e.g., *State* v. *Maguire*, 310 Conn. 535, 557, 78 A.3d 828 (2013). As we explained in *Maguire*, "the prosecutor's use of the term 'smoke and mirrors' . . . 'implie[s], to whatever degree, that defense counsel had not based his argument on fact or reason . . . but had intended to mislead the jury by means of an artfully deceptive argument.' . . . Indeed . . . a prosecutor who uses the [term] 'smoke and mirrors' 'implie[s] that the defendant's attorney intended to deceive and thereby impugn[s] the integrity of the defendant's attorney.' " (Citation omitted.) Id. When, as

in the present case, the octopus analogy is linked directly to the facts underlying a theory of the defense, the use of that analogy does not demean or disparage the integrity or role of defense counsel but, rather, serves to highlight what the state believes is a weakness in the defense theory. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 558, 949 A.2d 1092 (2008) ("[t]here is a distinction between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense" [internal quotation marks omitted]).

The prosecutor's use of the term "shotgun approach" and "[y]ou shoot it against the wall, and you hope that something will stick" is more problematic because that language frequently is used, without reference or regard to the actual facts, to disparage defense counsel. In the present case, however, it appears that the prosecutor used that terminology merely to underscore the fact that, from the state's perspective, the defendant's claim of police misconduct was a desperate and unavailing attempt to shift responsibility away from the defendant himself. Moreover, the reference was isolated and not repeated.[6] Although the "shotgun approach" argument generally is inappropriate and should be avoided because of the risk that it will be perceived by jurors as an allegation by the prosecutor that defense counsel is trying to deceive or confuse them, I cannot say that it fell outside the bounds of fair commentary in the present case in light of the context in which the argument was made.

The majority next maintains that the prosecutor improperly bolstered the credibility of a witness for the state, Carlos Ayala, a jailhouse informant, during direct examination. This alleged impropriety, which occurred when the prosecutor was questioning Ayala about whether the state had made any promises to him in return for his testimony against the defendant, is based on the following exchange between the prosecutor and Ayala:

"Q. What made you want to bring [information about the defendant] to the attention of the [Office of the State's Attorney] or to law enforcement in general?

"A. Maybe it could help my case.

"Q. So that's what you hoped was going to happen?

"A. Yes, sir.

"Q. *Again, I'm going to tell you, because, if you want to change your story, go ahead and change it.* [*There are*] *no promises to you. Okay? Period and end of story. Now, do you understand that?*

"A. Yes, sir.

"Q. *That's one thing to hope that something's going to happen, and it's another thing to be told or expected.* Did anybody give you any reason to expect something

good is going to happen with all your charges?

"A. No, sir.

"Q. You understand that?

"A. Yes." (Emphasis added.)

In addition, the majority asserts that the following related comments by the prosecutor during closing argument also improperly bolstered Ayala's credibility: "Ayala hopes he gets something for testifying? Sure he does. Sure he does. But the point is the defendant admits that he had the conversation with [Ayala], right, so that's a check one right there. The second thing is the state's not promising anything to . . . Ayala, and he made that clear to you, and *we make it clear to the jury*." (Emphasis added.)

When considered in context, I do not believe that the foregoing comments by the prosecutor improperly bolstered Ayala's credibility. Preliminarily, it bears noting that, as the Appellate Court explained, "[b]efore posing the questions [at issue] . . . the prosecutor asked Ayala about all the criminal charges he had pending, including 'some pretty serious charges.' The prosecutor also asked him about his prior convictions and the fact that he was on probation at that time. The prosecutor then asked Ayala to explain how he had come in contact with the [Office of the State's Attorney] regarding the defendant's case. After Ayala explained that he had contacted the [Office of the State's Attorney] and had met with a representative from that office, the prosecutor asked him if he or anyone 'from [that office] ever discuss[ed] that [he] would get any benefit from testifying in court today?' Ayala responded, 'No, sir.' The prosecutor then asked, 'All right. What were you told about if you testified? Explain to the jury in your own words:

'A. Nothing is promised.

'Q. Did I even discuss your cases?

'A. No, sir.' " (Citation omitted.) *State* v. *Albino*, supra, 130 Conn. App. 776–77. Thus, the record reflects that Ayala initially testified, without any prompting, that he had not been promised anything by the state.

More importantly, the challenged statements were not of sufficient import or consequence to implicate the defendant's due process right to a fair trial because there is nothing in the record to suggest that the state did, in fact, make any promises to Ayala in return for his cooperation against the defendant. Indeed, the defendant makes no such claim. There is no dispute, therefore, about Ayala's veracity with respect to his testimony denying that the state had promised him anything; his testimony on that matter was accurate. In such circumstances, when the credibility of a witness on a particular subject is not at issue, I do not see how statements by the prosecutor essentially confirming the

veracity of that witness' testimony on that very subject can be considered bolstering that rises to the level of prosecutorial overreaching. Thus, although the prosecutor's comments might have been improper if made under different circumstances, and although they were technically objectionable in the present context, they simply did not serve to reinforce Ayala's credibility in any material way. Moreover, we may presume that, if defense counsel believed that the form of the prosecutor's questions was improper, she would have objected to the questions, but she did not.

The same is true with regard to the prosecutor's closing argument. Although the statement "we make it clear to the jury" was ill-advised, not all comments by a prosecutor that are objectionable or otherwise may be characterized as injudicious or imprudent rise to the level of impropriety.[7] In the present case, the prosecutor's argument posed absolutely no risk of unfairness to the defendant because the facts that the prosecutor sought to make clear to the jury simply were not in dispute. In such circumstances, there is insufficient reason to conclude that the comment was improper.

The majority also concludes that the prosecutor improperly asserted, during closing argument, that, in order for the jury to credit the defendant's testimony about the shooting, it would have to find that the testimony of the various state's witnesses was "wrong." In the majority's view, this argument violated the rule that we articulated in *State* v. *Singh*, 259 Conn. 693, 702, 712, 793 A.2d 226 (2002), barring a prosecutor from compelling a witness, on cross-examination, to characterize another witness' version of the facts as a lie, and then emphasizing that cross-examination testimony in closing argument. I do not agree with the majority that our holding in *Singh* should be extended to the circumstances of the present case.

As this court explained in *Singh*, "[s]everal reasons underlie the prohibition on such [questioning by the prosecutor]. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. . . .

"Second, questions of this sort also create the risk that the jury may conclude that, in order to [find] the defendant [not guilty], it must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons

without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason." (Citations omitted; internal quotation marks omitted.) Id., 707–708. We further concluded that, for similar reasons, it also is improper for a prosecutor to require a witness to characterize another witness' testimony as wrong or mistaken. Id., 712. Because, however, no such questioning occurred in the present case, these considerations are wholly inapplicable.

This court also observed in *Singh* that prosecutors should "avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have *lied*. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason *other than deceit*." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) Id., 709–10. We therefore stated that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had *lied*, are . . . improper." (Emphasis added.) Id., 712. Thus, in contrast to the limitations that we placed on a prosecutor's cross-examination of a defense witness, which may not include questions urging that witness to characterize another witness' testimony as a lie, mistaken or wrong, our restriction on closing argument was limited to comments by the prosecutor to the effect that, to find the defendant not guilty, the jury must find that the state's witnesses had *lied*. At no time did the prosecutor in the present case make this assertion; rather, he argued that, to believe the defendant, it would be necessary for the jury to find that the testimony of the state's witnesses—all of whom contradicted the defendant in one or more material ways—was *wrong*. I see nothing improper with this argument because it represented an accurate statement of the case: either the jury believed the state's witnesses, all of whom supported the state's position that the defendant had murdered the victim, or the jury believed the defendant, whose testimony supported his contention that he had acted in self-defense. Under the circumstances, it was not improper for the prosecutor to characterize the jury's task as he did.

The defendant's final claim of impropriety involves the prosecutor's assertion that, upon consideration of the evidence in light of the state's burden of proof, the jury had a duty to find the defendant guilty of murder. This claim is predicated on the following argument by the prosecutor: "[H]old the state . . . to our burden. Evaluate our witnesses. Look at the evidence in this case. Hold the state to it. But, if you do that, and you

do your duty as jurors, there's only one conclusion you can reach; not that it's manslaughter in the first degree or manslaughter in the second degree, but this is murder and that it was not justified." As the majority notes, the prosecutor also argued to the jury that the defendant was entitled to an acquittal if the jury believed that the evidence indicated that he was acting justifiably in self-defense. The majority acknowledges that "the particular comment in the present case was not improper"; part II A 4 of the majority opinion; and I agree with that conclusion. The majority also states, however, that, "no doubt, '[t]here is perhaps a fine line between a proper and improper "do your duty" argument.' " Id., quoting *United States* v. *Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999). Although I do not dispute that an argument imploring the jury to do its duty could be couched in terms that render such argument improper, I believe that caution should be used in limiting the use of such an argument because defense counsel themselves frequently argue that, under the facts and circumstances presented, the jury has a duty *to find* the defendant *not guilty*. This argument by defense counsel is entirely reasonable and fair, and can be very effective, because it serves as a powerful reminder to jurors that they have a sworn obligation to find the defendant not guilty if the state has failed to meet its burden of proof. Thus, whether made by the prosecutor or defense counsel, the argument is perfectly proper when, as in the present case, it is linked directly to the evidence.

In sum, for the reasons set forth previously, I disagree with the majority that the prosecutor's statements and conduct in the present case were improper. In reaching its contrary conclusion, the majority disregards the maxim that counsel are entitled to fair latitude during closing argument. Of course, when a prosecutor's conduct, in closing argument or otherwise, crosses the line into impropriety, this court should not hesitate to characterize that conduct as improper and to reverse a conviction that has been tainted by such conduct. Unfortunately, as several recent cases reflect, prosecutorial impropriety too often has resulted in the need for a new trial. E.g., *State* v. *Maguire*, supra, 310 Conn. 562; *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 361, 390, 71 A.3d 512 (2013); *State* v. *Santiago*, 143 Conn. App. 26, 47, 51, 66 A.3d 520 (2013). But it is one thing for this court to identify, rebuke and remedy improper prosecutorial conduct, and it is something quite different to engage in nitpicking or a hypertechnical analysis of a prosecutor's actions that only serves to effectively confine the prosecutor to a rhetorical straitjacket. Because I do not believe that the prosecutor exceeded the bounds of propriety in the present case, I concur in the judgment.

[1] Under the circumstances of this case, I agree with the result that the majority reaches in part I of its opinion.

[2] The Appellate Court, like the majority, concluded that it was improper for the prosecutor to assert in closing argument that, for the jury to believe

the defendant's version of the events, it would have to find that the state's witnesses were "wrong." *State* v. *Albino*, 130 Conn. App. 745, 769, 24 A.3d 602 (2011). Although the Appellate Court also determined that certain other conduct by the prosecutor was improper, those determinations are not the subject of the present appeal. See generally id., 758–77.

[3] As the majority observes, the state acknowledged at oral argument before this court that it was inappropriate for the prosecutor to argue that, although the victim was alone when he approached the defendant and his confederates, the victim "won't be alone anymore, because you're going to get this case."

[4] I wish to emphasize that a prosecutor should be very careful to avoid unnecessarily provocative language, and, as a general matter, I do not endorse or encourage the particular rhetoric that the prosecutor employed in the present case. Under the circumstances, however, and with due regard for the fair latitude to which counsel are entitled during closing arguments, I cannot agree that the challenged argument constituted prosecutorial overreaching.

[5] Significantly, the prosecutor also made the following statement during closing argument: "[T]he state does not ask for nor does it want your sympathy for the loss of [the victim]. I want to make that clear. I want to make it so clear that there can be no misconception here. Sympathy is an emotion that has no place in this courtroom. What we ask, what we demand, is that you use your reasoning skills, your intelligence, your common sense, to evaluate the facts of this case, because, if you do that, you can conclude one thing: that the defendant intentionally took the life of [the victim] and that it was not justified either factually or legally. . . . Your recollection of the evidence is what controls, and I want you to understand that closing arguments are not evidence." Although I agree with the majority that "[t]he state cannot always remove the taint of improper argument simply by thereafter reciting a statement acknowledging the jury's duty not to decide the case on the basis of improper considerations"; footnote 3 of the majority opinion; such a statement is not insignificant when the challenged argument by the prosecutor is only arguably or marginally objectionable. Even if the comments at issue in the present case are viewed in the light most unfavorable to the state, the prosecutor's admonition to the jury to decide the case on the facts and not on the basis of sympathy for the victim undoubtedly clarified any conceivable ambiguity with respect to the meaning or import of the challenged comments.

[6] The majority states that, "[i]n *State* v. *Salamon*, [supra, 287 Conn. 559], we concluded that, '[a]lthough the term "smoke screen" is more problematic [than "red herring"] because it may be viewed as connoting an intent to deceive; see [Webster's Third New International Dictionary] (defining "smoke screen" as "something designed to obscure, confuse or mislead"); we cannot say that the use of that term, which was isolated, rises to the level of an impropriety.' In retrospect, it appears that we conflated the questions of whether the statement was improper and whether the impropriety deprived the defendant of a fair trial. Under the latter, we consider the frequency of the impropriety as one factor. See *State* v. *Warholic*, 278 Conn. 354, 396, 897 A.2d 569 (2006); cf. *State* v. *Outing*, 298 Conn. 34, 85, 3 A.3d 1 (2010) (expressing disapproval of prosecutor's use of terms smoke screen or smoke and mirrors 'even as an isolated reference'), cert. denied,      U.S.     , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011)." Footnote 6 of the majority opinion. I disagree with the majority's assertion, which, of course, is mere dictum, because the term "smoke and mirrors" was not used by the prosecutor in the present case. As this court repeatedly has stated, not "every use of rhetorical language or device [by the prosecutor] is improper. . . . The *occasional use* of rhetorical devices is simply fair argument." (Emphasis added; internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 611. Thus, a certain term or rhetorical flourish may not be improper if used in isolation or when viewed in a particular context, but it may rise to the level of an impropriety if used excessively or in a context that renders it inappropriate. Indeed, the use of particular language may be improper in some or even many cases, but, when considered in the context of a particular case, the language may be so innocuous or inoffensive that it is not improper as used. Indeed, in *Salamon*, after observing that "not every use of rhetorical language is improper"; *State* v. *Salamon*, supra, 558; we explained, with respect to the prosecutor's use of the term "smoke screen," that the relevant portion of the prosecutor's argument "reasonably may be characterized as peripheral, inconclusive or unimportant." Id., 559. We therefore concluded that the isolated use of the term, when viewed in the broader context of

the argument as a whole, did not rise to the level of an impropriety. Id. Because I believe that our analysis in *Salamon* was correct, I disagree with the majority's contention that, in *Salamon*, we were required to determine that the use of the term "smoke screen" was improper but that it did not deprive the defendant in that case of a fair trial. Under the majority's approach, this court was obligated to address the second prong of the due process test, that is, the extent of the harm resulting from the challenged argument, even though we reasonably concluded that, under the circumstances in which that argument was made, it simply was not improper in the first place. I see no logical reason for this methodology.

[7] Only conduct by a prosecutor that creates some possible risk of a due process violation reaches the threshold of prosecutorial impropriety. Other conduct does not, even though it may be objectionable. For example, it is "improper," in the sense that it is objectionable, for a prosecutor to question a state's witness in a leading manner. In the absence of special circumstances, however, leading questions do not implicate the fundamental fairness of a trial, and, consequently, they are not improper in a constitutional sense, that is, they do not give rise to due process concerns.